(No. 6060.   December 30, 1933.)

EDWARD STRAUS, MILTON STRAUS and C. E. NICHOLSON, Petitioners, v. JANET A. KETCHEN, County Treasurer and *Ex-officio* Tax Collector of Ada County, Defendant.

[28 Pac. (2d) 824.]

Thomas L. Martin, for Petitioners.

Homer E. Martin, Prosecuting Attorney of Ada County, and Charles F. Reddoch, for Defendant.

WERNETTE, J.—This is an original application for a writ of mandate to require the defendant, as county treasurer and *ex-officio* tax collector of Ada county, Idaho, to accept certain bonds of Drainage District No. 2, in Ada county, and cash tendered by petitioners, and issue receipts therefor showing full payment of the assessments for benefits made by the drainage district against petitioners' lands, described in the petition, and note the full payment thereof on the assessment-roll of said district, pursuant to the provisions of chapter 183, Session Laws 1933. The issues are presented by the petition, setting forth three distinct causes of action, the answer thereto, and a stipulation of facts between the parties.

Drainage District No. 2 is located in Ada and Canyon counties, and embraces an area of approximately 27,000 acres of land owned by 1,100 property owners. It is stipulated that the total benefits accruing to the lands in said district aggregate $1,943,939.74. Against this land there was made a total assessment, for benefits accruing to the separate tracts of land, in the sum of $650,817.51, for construction of works, expenses, etc. The assessment so made consisted of 1,945 separate assessments against the various tracts of real property within the district. To raise money for the construction of the drainage works the district issued and sold, under authority of the court, a total of $583,000 in bonds. The bonds were sold in two issues, the first issue dated August 1, 1920, maturing serially during the period of years from 1925 to 1934, and the second issue dated

August 1, 1922, maturing serially from 1927 to 1940. Had the bonds been paid according to their maturities there would have been paid $404,000, leaving outstanding $179,000, in principal. Instead the district only paid in principal the sum of $95,000, leaving unpaid and outstanding $487,500 of the original issues. However, the district was able and did refund the bonds that matured in 1926, 1927, 1928, 1929, 1930, and about one-half of those maturing in 1931. And the refunding bonds issued August 1, 1926, in the total sum of $44,000, were certified under the provisions of chapter 218, Session Laws 1921. At the present time there are outstanding, past due and unpaid bonds in the sum of $165,000, which the district is unable to pay.

Annually the commissioners of the drainage district have levied an assessment against the lands in the district, based upon the assessment-roll, for the payment of interest on bonds, the creation of a sinking fund for the payment of principal, and for operation, maintenance and repair of the drainage works of the district. The aggregate amount of the assessments for the payment of bonds and creation of a sinking fund, for the payment thereof, from 1921 to 1932, inclusive, is 22.3 per cent of the total assessment for benefits against lands within the district.

The petitioners are the owners of certain lands within Drainage District No. 2, consisting of three distinct parcels of land. Petitioners' lands were assessed for benefits to accrue by reason of the construction of the works of said drainage district, and they have paid to defendant all annual assessments levied by the commissioners of said drainage district to date, of every kind, and by reason thereof have paid their proportionate part of the interest on all outstanding bonds to August 1, 1933, or 22.3 per cent of the total assessment for benefits against their said lands. The lands of petitioners are high lands and were assessed upon the basis of damage done to low lands from seepage and saturation by irrigation water from high lands, and the total amount said lands of petitioners were deemed actually benefited aggregates $5,516.83. There has been assessed

against the lands of petitioners total assessments in the sum of $1,745.14, for their proportionate cost of the works of said district, of which amount they have paid $389.39, leaving unpaid the sum of $1,356.75.

As is shown in the first cause of action, the balance of the principal of the assessment on the property described therein, remaining unpaid, was the sum of $706.99, as of July 27, 1933. On that date petitioners tendered to defendant bond number 13 of said drainage district, dated August 1, 1929, due August 1, 1937, in the principal sum of $500, with interest coupons attached thereto, numbers 8 to 16, inclusive, each coupon for the sum of $15, and evidencing the interest to become due on the bond, and coupon number 8 being due and payable August 1, 1933, together with $206.99 in cash.

In the second cause of action the petitioners adopt all of the first cause, except that in the second cause of action the balance of the principal of the assessment on the property described therein, remaining unpaid, was the sum of $509.36, as of July 27, 1933. On said date the petitioners tendered to defendant bond number 14 of said drainage district, dated August 1, 1927, due August 1, 1932, in the principal sum of $500, and also cash in the sum of $9.36.

The third cause of action also adopts all of the first cause, except that in the third cause of action the balance of the principal of the assessment on the property described therein, remaining unpaid, was the sum of $140.40, as of July 27, 1933. On said date the petitioners tendered to the defendant, in cash, the sum of $140.40.

When these tenders were made petitioners demanded of defendant that she accept the bonds and cash, and issue to petitioners receipts in full for the assessments against the respective parcels of land, and note the full payment thereof on the assessment-roll of said district. The defendant refused the tender and refused to issue a receipt in full for the unpaid balance of the assessment against said land, or to note upon the assessment-roll that the assessments had been paid in full.

The petitioners made the tender of the bonds and cash to defendant pursuant to chapter 183, Session Laws 1933, which provides:

"The owner of any land within any drainage district charged with the lien of any assessment under the provisions of Title 41, Chapter 25, Idaho Code Annotated, may redeem the same from all liability by paying the unpaid portion of the assessment lien against such land, as shown by the assessment roll of said district, plus interest to the time of such payment; provided that the bonds of the drainage district and the accrued interest coupons thereon shall be accepted by the tax collector as cash in payment of such lien and assessment; and upon payment by any land owner of such lien and assessment against any land the same shall be relieved of all further liability and shall not be subject to any further or subsequent assessment by said district except only for the maintenance and operation of the drainage works of the district; and, provided, further, upon full payment being made, as hereinabove provided, in cash and/or bonds and interest coupons, the tax collector shall issue to such owner a receipt showing the lien of the assessment against such land is fully paid and satisfied; and such tax collector shall also note upon the assessment roll of said district the full payment of the assessment against such land. All bonds and interest coupons delivered to the tax collector under the provisions of this Act shall be cancelled in the same manner as bonds which have been called for payment and paid."

It is the contention of petitioners that the defendant, in each instance, should have accepted the bonds and cash as full payment of the assessment levied against their property; that the drainage district is a local improvement district and that the bonds issued and sold by said district are local improvement district bonds; that the commissioners of said district have no right or authority to levy assessments against the lands of plaintiffs for the payment of bonds or construction works of said district in excess of 100 per cent of the total original assessment of benefits.

On the other hand the defendant, in her answer, denies that the drainage district is a local improvement district and denies that the bonds are local improvement district bonds, but alleges affirmatively that the bonds are general obligation bonds; that the outstanding bonds of said district were issued, negotiated and sold prior to the effective date of chapter 183, Session Laws 1933; that at the time the bonds were issued the laws of the state provided and required that the annual assessments made by the commissioners against drainage districts should be placed on the tax roll of the county and be payable at the same time, and in the same manner as general taxes, and in the event of delinquency should be subject to the same penalty, interest and right of redemption as general taxes; that the bonds of said district require the payment thereof, both principal and interest in lawful money of the United States, and the same shall be redeemed and paid in numerical order.

The defendant further answers petitioners and alleges, that to permit petitioners to discharge the lien against their lands created by the assessment for benefits, and release the same from the obligation of paying the outstanding bonds, under the provisions of chapter 183, Session Laws 1933, impairs the contract and obligation between the land owners and the holders of the district's bonds, in that it decreases the security and value thereof, and changes the method of payment in violation of and contrary to article 1, section 16, of the Constitution of Idaho, and article 1, section 10, of the Constitution of the United States; that it permits the payment and discharge of the lien created by the assessment of benefits, the retirement and redemption of the bonds in a manner different than that provided by law at the time of the issuance and sale thereof to the injury and financial detriment of the holders thereof; and it is an attempt to deprive the holders of said bonds of the right to have all of the property within the district assessed annually for the payment of principal and interest thereon, until the same are fully paid, in violation of the rights and to the damage of said bondholders.

As to the facts, as set forth in the pleadings and stipulation entered into by the parties, there appears to be no controversy. While many propositions of law are seriously urged and contended for, they all relate to the one substantial and vital question involved, namely, the constitutionality of said chapter 183, Session Laws 1933, as to whether said act impairs the obligation of the contract as between the bondholders and land owners in violation of article 1, section 10, of the Constitution of the United States, and article 1, section 16, of the Idaho Constitution.

Petitioners, among other things, in defense of their position that the act in question is not violative of the constitutional provisions, argue that a drainage district is a local improvement district, and that the bonds are local improvement bonds. This is denied by defendant; defendant alleging affirmatively in her answer that the bonds of a drainage district are general obligation bonds.

The drainage law was first enacted by chapter 16, Session Laws 1913, which, with later amendments, is now embodied as title 41, chapter 25, Idaho Code Annotated. It appears that the legislature by chapter 257, Session Laws 1927, enacted a local improvement code, now embodied as title 49, chapter 25, I. C. A., in which no provision was made for drainage districts. Attorneys for defendant argue that had the legislature deemed drainage districts to be in the class of local improvement districts provision would have been made therefor in such code, and that it is very significant that such was not done. Much space is devoted in the briefs of both parties, as to whether a drainage district is a local improvement district. Petitioners taking the position that in view of the fact that a drainage district is a local improvement district, that bonds of the district are limited obligations and not general obligations of the district. While denied in defendant's answer, it was conceded by defendant in the oral argument before the court that they are not general obligations, otherwise they would be violative of article 8, section 3, of the state Constitution.

It was held by this court in *Burt v. Co-operative Irr. Co.*, 30 Ida. 752, 168 Pac. 1078, that "the drainage districts provided for by the laws of this state are *quasi* corporations, being public in their nature and designed to accomplish purposes conducive to the general welfare." Also, see *Sebern v. Cobb*, 41 Ida. 286, 238 Pac. 1023.

In the case of *Elliott v. McCrea*, 23 Ida. 524, 130 Pac. 785, Chief Justice Ailshie, speaking for the court, stated:

"It is next argued that collection of assessments and taxes for benefits under the scheme provided in the act in question does not afford due process of law or the equal protection of the law, and is therefore in violation of sec. 5, art. 7, of the state constitution. The first reply that may be made to this contention is that the assessments to be levied and collected under the provisions of the act here in question do not constitute a tax within the purview of the constitution. This is rather an exercise of the power of the state for the general welfare. (*Hagar v. Reclamation District*, 111 U. S. 701, 4 Sup. Ct. 663, 28 L. ed. 569; *Fallbrook Irr. Dist. v. Bradley*, 164 U. S. 112, 17 Sup. Ct. 56, 41 L. ed. 369; *McGilvery v. City of Lewiston*, 13 Ida. 347, 90 Pac. 348.) Under this act, the assessment is made only according to benefits to be received. *Where no benefits will accrue, no assessment can be made.* No question of taxation for governmental purposes or for the maintenance of the governmental functions of the state is imposed. This assessment is made in proportion to benefits to be acquired, and is intended primarily to serve and advance the proprietary interests of the land owners within the district, and to that end serve and advance the interests and general welfare of the state at large. Incidentally, this may and often will serve and improve the public health of the inhabitants of the district or render a district habitable which otherwise would be uninhabitable. To our minds, the same principles of law which would sustain and uphold the irrigation statute should sustain and uphold this statute. (*Pioneer Irr. Dist. v. Bradley*, 8 Ida. 310, 101 Am. St. 201, 68 Pac. 295; *Nampa etc. Irr. Dist. v. Brose*, 11 Ida. 474, 83 Pac. 499; *Bissett v.*

*Pioneer Irr. Dist.,* 21 Ida. 98, 120 Pac. 461; *Pioneer Irr. Dist. v. Stone,* [23 Ida. 344], 130 Pac. 382.)

"Lastly, it is contended that the plan provided for bonding a district is violative of sec. 3 of art. 8, of the state constitution. This objection must fail, for the same reason that a like objection failed in *McGilvery v. City of Lewiston,* 13 Ida. 347, 90 Pac. 348, *Byrns v. City of Moscow,* 21 Ida. 403, 121 Pac. 1043, and *Hickey v. City of Nampa,* 22 Ida. 46, 124 Pac. 280; namely, that the assessment here authorized to be levied runs against each specific tract or parcel of land to be benefited, *and the amount thereof is ascertained, determined and assessed in advance, so that every property owner can know just how much he is to pay and the bondholder can ascertain just the extent of the claim he has against each tract of land.* In such case, there is no municipal liability and no municipality to be rendered liable for the payment of the indebtedness."

██ Considering the object and purposes contemplated by the legislature in the enactment of the law, and the method and means provided for toward their accomplishment, we feel certain that a drainage district is a local improvement district, and from the mere fact that it was not included within the local improvement district code it does not necessarily follow that it is not a local improvement district, if it is such in fact. Defendant contends that the distinguishing features or earmarks of a local improvement district, and the obligations thereof are, that provision has been made for the property owner to pay the liability against his property by the assessment of benefits both before and after the issuance of bonds thereof, and that the holder of its obligation is given the right of foreclosure; citing a number of sections of the local improvement district code, chapter 25, I. C. A. But such is not the exclusive test, if at all, as said particular provisions have reference merely to the manner of payment and the remedy of the bondholder. If the law provides for the organization of a district intended primarily to serve and advance the proprietary interests of the land owners within the district, or in

other words, where particular local benefits are to be derived, and assessments can be made only according to benefits to be received, and liability so limited, as in this instance, such district would be a local improvement district.

The law is so well settled that the statutes of this state and decisions of the courts, that were in force at the time of the issuance of the bonds in question, became a part of the contract, as between the bondholders and the property owners, that citation of authority is deemed hardly necessary. In *Fidelity State Bank v. North Fork Highway Dist.*, 35 Ida. 797, 209 Pac. 448, 31 A. L. R. 781, this court quoted with approval the law as announced by the supreme court of the United States in the case of *Von Hoffman v. Quincy*, 4 Wall. 535, 18 L. ed. 403, as follows:

" 'It is also settled that the laws which subsist at the time and place of the making of the contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge, and enforcement.' "

Citing many additional authorities. See, also, *Oregon Short Line R. Co. v. Berg*, 52 Ida. 499, 16 Pac. (2d) 373.

Each of the bonds in question, among other things, contain the following provision:

"Both principal and interest of this bond are payable in gold coin of the United States of America of the present standard weight and fineness, at the office of the County Treasurer in Boise, Idaho, or at the National Park Bank in New York, New York, at the option of the holder.

"This bond and series of bonds of which it is one, are payable from benefits heretofore levied upon each tract, parcel or governmental subdivision in the said drainage district, which assessment of benefits has been in all respects ratified and confirmed by the order of the court, which order is now conclusive as to the regularity of all proceedings relating to the assessment of benefits under the laws of the State of Idaho.

"This bond is subject to redemption in numerical order by the Treasurer of Ada County whenever he has upon hand $5,000 of the special fund for the payment of said bonds, after said bonds have run for a period of three years, upon the giving of notice thereof in the manner provided by law.

"For the faithful performance of all covenants, recitals and stipulations herein contained, for the proper application of the proceeds of the taxes heretofore or hereafter levied and for the faithful performance in apt time and manner of each official act required and necessary to provide for the prompt payment of the interest and principal of this bond as the same mature, the full faith, credit and resources of said drainage district are hereby irrevocably pledged."

The various provisions of the drainage district laws of the state, as well as the decisions of this court, in so far as applicable, became a part of the contract between the land owners within the district and the bondholders, as completely as if the same had been written in the bond.

Pursuant to the drainage district laws then in force, the bonds were issued against the entire assessment for benefits, as contained in the assessment-roll of the district, which had been approved and confirmed by the court, which action of the court had become final and conclusive. The bonds are payable in gold coin of the United States. The money to pay the same was to be obtained by annual assessments or calls to be made by the commissioners of the district, against the lands as contained in the assessment-roll. The bonds were to be redeemed in their numerical order, in money and not otherwise. The full faith, credit and resources of the district were pledged to fulfill such obligations.

Both parties agree, and correctly so, that the issuance and sale of the bonds by the district, and the purchase by the bondholder creates a contractual relation between the bondholder and the property owner within the district. (*Security Trust & Savings Bank v. City of Los Angeles*, 120 Cal. App. 518, 7 Pac. (2d) 1061; *San Diego County v. Childs*, 217 Cal. 109, 17 Pac. (2d) 734.) The question then

arises: Do the provisions of chapter 183, Session Laws 1933, heretofore quoted, impair the obligation of such contract? It is contended by the defendant that it does so impair the obligation of the contract in the following particulars: (a) It provides a medium of payment different than that specified in the bond. (b) It destroys the security of the bondholder. (c) It favors the land owner within the district, who owns a bond, to the disadvantage of those owning no land therein. (d) It abolishes the numerical order of redemption.

If, in fact, in any of the instances contended for by defendant, the obligation of the contract in question is actually impaired, then defendant must prevail in this action. Article 1, section 10, Constitution of the United States provides: "No state shall pass any law impairing the obligation of contracts. . . . . " Article 1, section 16, Constitution of Idaho provides: "No . . . . law impairing the obligation of contracts shall ever be passed." In *Fidelity State Bank v. North Fork Highway Dist., supra,* this court said:

"The obligation of a contract is impaired by a statute which alters its terms, by imposing new conditions or dispensing with conditions, or which adds new duties or releases or lessens any part of the contract obligation or substantially defeats its ends. It is not only private contracts that are protected from impairment by state law. The protection also extends to contracts made by a state or a municipal corporation."

In the case of *Oregon Short Line R. Co. v. Berg,* 52 Ida. 499, 16 Pac. (2d) 373, this court said:

"Furthermore, while a tax is considered not a contract, the bond and the obligation thereof as between the bondholder and the property owner within the improvement district clearly becomes a contract of limited liability.

"To now in effect increase the liability upon these bonds to the extent of the special additional tax on internal tax payers would, to that extent, impair the obligation of their contract by increasing their liability."

Citing cases, and further, approving the language used by the Connecticut court in the case of *O'Connor v. Hartford Accident & Indemnity Co.*, 97 Conn. 8, 115 Atl. 484, as follows:

"Any law which changes the intention and legal effect of the original parties, giving to one a greater and to the other a less interest or benefit in the contract, impairs its obligation. The extent of the change is immaterial. Any deviation from its terms by hastening or postponing the time of performance which it prescribes, or imposing conditions not included in the contract, or dispensing with the performance of those that are included, however small and unimportant they may appear to be in their effect, impairs the obligation of a contract."

Prior to the enactment of chapter 183, Session Laws 1933, there was no provision in the drainage law for the property owner to discharge or pay the lien of the assessment of benefits against his property before the issuance of the bonds of the district, nor after the issuance thereof, except to pay the annual calls for assessment, made by the commissioners of the district, as they became due.

By our code the organization of a drainage district has its inception in the filing of a petition, sec. 41-2505; the hearing thereon, sec. 41-2508; and the decree of the court, sec. 41-2509. After the organization of the district three commissioners are appointed by the court, sec. 41-2510. After the qualification of these commissioners, and within the time directed by the court, the commissioners make an examination of all lands described in the petition and proposed to be drained and protected, and the lands over and on which the works are proposed to be constructed, and shall determine and report, sec. 41-2514. The fifth subdivision thereof being:

"5. What lands will be benefited by the construction of the proposed work, whether the benefits will equal or exceed the aggregate cost of constructing such work, including all incidental expenses, costs of proceedings and damages; and they shall apportion and assess the estimated cost of the

same on the lands so benefited by setting opposite the correct description of each tract, lot or easement, the portion of such cost assessed as benefits thereon. And if any particular part of the work so proposed to be done shall be assessed upon any particular tracts or lots of land or upon any municipality or corporation they shall so specify; and if any municipality or corporation should in their judgment bear a part of the expense or as such will derive a public or special benefit from the whole or any part of such proposed work, they shall so report and assess the amount of such benefits.''

When the commissioners have finished this work they again report to the court and hearing is had on the proposed construction and the assessment of benefits, as provided in sections 41–2519, 41–2521 and 41–2522. Pursuant to section 41–2519, if the commissioners report the entire cost is more than the increased value which will accrue to the lands in the district, the proceeding will be dismissed, while if the increased value will exceed the cost the court will proceed to hearing. If the assessments made by the commissioners are confirmed by the court, and the commissioners are authorized to proceed with the work, then an assessment-roll is made up and filed, as provided in sections 41–2535 and 41–2536. Regarding the assessment-roll, section 41–2535, provides in part, as follows:

''Upon the entering of the order confirming the apportionment of costs and awarding of damages as hereinbefore provided for, the clerk of said court shall immediately prepare a transcript which shall contain a list of all lands which are so assessed and awarded damages in said report and shall certify the same to the recorder of the county in which said lands are situated and said statement so certified shall specify the amount of the assessment upon each tract, parcel or governmental subdivision, . . . . and the said county recorder shall thereupon enter such order of record and the same shall be notice of a lien of said assessment to all persons. . . . . ''

Section 41–2536, requires a certified copy of said roll to be filed with the county auditor, providing:

"A similar transcript duly certified by the clerk which shall contain a list of the names of all persons and corporations benefited by said improvement and the amount of the assessment upon each lot, parcel or governmental subdivision shall be by said clerk filed with the auditor of the county, who shall immediately enter the same upon the tax rolls of his office, as provided by law for the entry of other taxes, against the land of each of the said persons named in the list, together with the amounts thereof; and the same shall be subject to the same interest and penalties in case of delinquency as in the case of general taxes and shall be collected in the same manner as other taxes and subject to the same right of redemption, and the lands sold for the collection of said taxes shall be subject to the same right of redemption, as the sale of lands for general taxes; provided, that said assessment shall not become due and payable except at such time or times and in such amounts as may be designated by the board of commissioners of said drainage district, which designation shall be made to the county auditor by said board of commissioners of said drainage district, by serving written notice upon the county auditor designating the time and the amount of the assessment, said assessment to be in proportion to the benefits to become due and payable which amount shall fall due at the time of the falling due of general taxes, and the amount so designated shall be added by the auditor to the general taxes of said person, persons or corporation, according to said notice, upon the assessment rolls in his said office, and collected therewith; provided further, that no one call for assessment by said commissioners shall be in an amount to exceed twenty per cent of the actual amount necessary to pay the cost of proceedings, and the establishment of said district and drainage system and the cost of construction of said work."

After the assessment-roll has been confirmed by the court, the commissioners then have power to proceed with construction of the works and pay therefor, sections 41–2539,

41–2540 and 41–2544. The commissioners also have power to issue and pay warrants, sections 41–2549 and 41–2550. And they are also authorized to issue bonds to pay the entire cost of the work and improvements and all expenses incident to the organization of the drainage district, including damages assessed, as provided in section 41–2552, with this limitation, however, "provided further, that the total amount of bonds shall not exceed ninety per cent of the assessments levied against the lands of the district." In the event that bonds are issued, section 41–2554, in part, reads as follows: "Said bonds shall be numbered from one upward, consecutively, and be in denominations of not less than $100.00 nor more than $1,000. . . . . " Section 41–2557 provides, with regard to the calling of the bonds, as follows:

"It shall be the duty of the treasurer of any county in which there may be a district issuing bonds under the provisions of this chapter whenever he has upon hand $5000 of the special fund for the payment of said bonds, and when said bonds shall have run for a period of three years, to advertise in the newspaper doing the county printing, for the presentation to him for payment of as many of the bonds issued under the provisions of this chapter as he is able to pay with the funds in his hands to be paid in numerical order of said bonds, beginning with the bond number one, until all of said bonds are paid: provided, that thirty days after the first publication of said notice of the treasurer calling in any of said bonds, said bonds shall cease to bear interest."

Section 41–2562 relates to the levy of and limitation on assessments, and reads as follows:

"The commissioners may also levy assessments for any expense necessarily incurred by them for construction, maintenance, repair, or any extraordinary reason, and also may add to said assessment sufficient to pay any deficiency occurring the preceding year or any other unpaid warrant indebtedness, if any, or to pay any outstanding warrants: provided, that any assessments to be hereafter made by any drainage commissioners to pay warrants shall not exceed

twenty per cent of the original cost of organization and construction in addition to the assessments which may be levied under section 41–2536, and such assessments, when made, shall be apportioned and collected as hereinbefore provided for.''

The sections of the statutes referred to and quoted are the most essential ones to be considered in the discussion and solution of the questions raised by the parties, being in force and effect at the time 'of the issuance of the bonds in question.

■ As we view the law, the assessment of benefits for the cost and construction of the works becomes an undivided lien against each piece of property within the district, to the extent of the assessment against it, and each bond has as its security an undivided lien against each piece of property to the extent of the amount of the assessment against it, and the security continues until each bond is paid.

In the case of *In re Cranberry Creek Drainage Dist.*, 202 Wis. 64, 231 N. W. 588, 85 A. L. R. 242, the court had before it for consideration a statute passed in 1927, authorizing land owners within the drainage district to pay their taxes with bonds or past due interest coupons. The Cranberry Creek drainage district issued its bonds April 1, 1907, which were to be paid in lawful money of the United States, obtained by instalments of special assessments against the land within the district. The court, in part, said:

''The question arises whether, under section 89.376 Stats., the town treasurers in the towns in which the drainage district is located, and the county treasurers of Juneau and Wood counties, have any authority in law to accept such bonds, notes, or coupons in payment of drainage taxes on specified lands in said district.

''The respondents admit that the district's financial condition is bad, as is shown by the petition, and will continue to grow worse by accumulation of interest if its interest-bearing obligations cannot be retired, and argue that the use of the bonds in paying assessments retires the used bonds and stops interest on bonds thus paid.

"While this may be true, it does not give due considera-
tion to the fact that allowance of payment by bonds of the
assessment pledged to the payment generally of all bonds
takes from bondholders, other than those using the bonds
for that purpose, security afforded by the lands on which
the assessments were levied and the funds and credits be-
longing to them. As suggested in appellant's brief: 'It
goes without saying that if fifty per cent. of the lands in the
district are good and fifty per cent. are worthless, the bonds
used for payment will be used to redeem the drainage cer-
tificates outstanding on the good land and the improved
land, leaving the bondholders whose bonds have not been
used 'for redemption to collect their bonds only out of the
poorer or worthless lands.'

"There is no misunderstanding about the source to which
the bondholders must look for payment of their securities.
The bond constitutes a lien upon the assessments. Any
legislation which changes that source or affects the distribu-
tion and allotment of the avails of the assessment impairs
the obligation of the bonds whereby the several installments
of special assessments are pledged for the benefits of all of
the bondholders, and whereby a proper disbursement of the
proceeds is specially pledged to all bondholders.

"Respondents insist that there are benefits yet unassessed
for construction, and that out of these assessments the bond-
holders may be paid. This forcing the bondholder to ac-
cept a different method of obtaining his money from that
which was promised, and which induced him to make his
investment. Even if the experience of the district gave any
assurance that the additional assessments would be paid,
the owner of the bond could not be compelled to accept the
change. 'Several general propositions are, however, settled
so as to require in new cases merely their application. First
and most primary among these is that an act which in any
degree, no matter how slightly modifies the obligation of the
contract by attempting to relieve the one party from any
duty by the contract assumed, is repugnant to the constitu-
tional prohibition.' (Citing cases.)

"Respondents' claim that section 89.376 does not modify the contract cannot be sustained. The purpose of the statute is to give landowners in the district an opportunity to offset bonds held by them against drainage assessments on their land, thus providing an advantage for this class of bondholders over the others who own no land in this district. The cases cited: . . . . , in effect sustain the petitioners' position and, in so far as they treat of orders or county certificates for taxpaying purposes, hold that these may be used only where it is expressly provided. No such provision was made at a time when the bonds could in any way be affected. The bonds under consideration here are to be paid in cash.

"The act referred to impairs the obligation of the petitioners' contract, as represented by their bond, and offends against article 1, sec. 10, Constitution of the United States, and article 1, sec. 12, of the Wisconsin constitution."

In the case of *Howard v. State*, 226 Ala. 215, 146 So. 414, 419, the Alabama court had before it a statute adopted September 30, 1932, which authorized cities and towns of the state, by the adoption of an ordinance, to authorize the payment of special assessments with bonds and coupons of the improvement district against which they were issued. The city of Florence adopted such an ordinance and a property owner attempted to pay his assessments, levied in 1923, for the payment of bonds of the city, with other bonds of the district as provided for by the statute and ordinance, which the city clerk refused to accept. The lower court held with the property owner and taxpayer, but the supreme court reversed the lower court and, among other things, said:

"When the improvements, in respect of which these bonds were issued, were completed, and the assessments made final against all of the benefited property, each holder of one of the 124 bonds issued to pay the cost of such improvements had vested in him a 1/124th interest in the liens given by the statute upon *each of the many pieces of property*, against which the assessments were levied. These lots or parcels of land were of different values; some were worth more than the amount assessed respectively against such property,

and some were, or may have been, or may be at this time, worth less than the amount of the assessments against such parcels. The probability of collecting in full each assessment is dependent upon the value of all the property taken as a whole. If every bondholder had a lien upon one piece of property, that is, if every bond was secured by an assessment against one parcel of property, the situation would have been different, and every bondholder would have been forced, in order to determine the value of his security, to ascertain the value of the particular piece of property covered by the assessment which stood as security for his particular bond. If that had been the case, the bondholder would have no right to object to the later enactment of a law which permitted his bond to be used in the payment of the assessment against the only piece of property on which he held a lien. Such is not the case. Each holder of one bond has a 1/124th vested interest in each, and all of the assessments, and that security cannot be impaired by any statute subsequently enacted impairing that lien.

"It is, therefore, apparent that the amendment to section 2216 of the Code, added by the Act of September 30, 1932, does not afford a substantial equivalent to the provisions of section 2216 of the Code of 1923, or section 1401 of the Code of 1907, and, therefore, the amendatory Act of September 30, 1932, violates article 1, sec. 10, of the Constitution of the United States, and section 22 of the Alabama Constitution."

The reasoning and principles of law announced in both the Wisconsin and Alabama cases are logical and sound, and applicable in this case.

Petitioners claim, however, that the provision of the law directing that the bonds shall be paid in their numerical order is but directory, and not mandatory; that the owner of bond number 50 has just as much right to have his bond paid first as the owner of bond number 1. To such contention we cannot subscribe. Petitioners refer, in support of their contention, to *Meyers v. City of Idaho Falls*, 52 Ida. 81, 11 Pac. (2d) 626. Said case is readily distinguishable and not applicable to the instant case. In that case the par-

ticular law in question provided for numerical priority as to bonds, and contained an equality clause as well. It was held that the two provisions were *in pari materia* to be construed together, so that each may be given effect if possible; that in construing statutes *in pari materia* the history of such legislative law should be taken into consideration in order to determine the uniform and consistent legislative purpose; that where the particular section of the statute provides for numerical priority, though the language may be mandatory in form, if another section of the law contains an equality clause, then the form of the statute must give way to legislative intent in case of conflict, and the mandatory provision providing for numerical priority will be construed directory only. The court also held, where by reason of default of special assessments and general taxes on property within the improvement district the final fund is insufficient to pay all the serial bonds outstanding, then the fund on hand must be distributed *pro rata* among the unpaid bondholders, regardless of numerical priority.

No such situation confronts us in this case. We find no provision in the drainage law providing that drainage district bonds shall be equal liens upon the property for the assessments represented by such bonds, without priority of one over another to the extent of the several assessments against the several lots and parcels of land, commonly known as an equality clause. Nor are we confronted with a final distribution of the only funds available for the payment of bonds now outstanding. We hold that the provisions in the drainage district law providing for numerical priority is mandatory; a provision which the bondholders have an absolute right to rely upon.

There is no merit in the contention made by the defendant that the property owners within the district can be called upon and required to pay assessments equal to the amount of the actual benefits inuring to the respective parcels of land, by reason of the improvements made. That question was definitely settled by this court in the case of *Elliott v. McCrea, supra,* where the court said, at page 530:

"That the assessment here authorized to be levied runs against each specific tract or parcel of land to be benefited, *and the amount thereof is ascertained, determined and assessed in advance,* so that every property owner can know just how much he is to pay and the bondholder can ascertain just the extent of the claim he has against each tract of land." (Italics ours.)

The assessment referred to by the court in such language is the one that is made by the commissioners in the first instance, to pay for the costs of the improvements, costs of proceedings, etc., which is then submitted to the court for confirmation. The property owner, at such time, knows the full extent of the assessment made against his property, which gives him the opportunity of appearing before the court and protesting as against its confirmation, if he feels that it is not fair and equitable. It had no reference to any assessments that might be later made, equal to the actual benefits accruing to the respective pieces of land, because that fact had never been determined.

At no time has the drainage district law required that the actual benefits accruing to each individual tract of land be definitely determined. Section 41–2514, providing for the determination of the assessments as benefits, does not provide as a duty on the part of the commissioners to ascertain and determine the actual benefits accruing to each tract or lot, or that the amount of benefit to each tract or lot shall be set forth in connection therewith. Subdivision 5 of said section merely requires the commissioners to determine what land will be "benefited by the construction of the proposed works," and further, "whether the benefits will equal or exceed the aggregate cost of constructing such work." In other words the commissioners need only find that the total benefits will equal or exceed the total cost.

The fact that the commissioners of Drainage District No. 2 did actually set forth opposite each tract or lot of land the amount which they estimated the same was actually benefited, is no more binding than if they had not done so at all, for under the law they were not required to do so.

In view of the fact that no provision is made in the drainage district law to have specifically determined the actual amount of the benefits accruing to the same on account of the improvements, it must necessarily be concluded that the legislature never intended that assessments could be made against the property equal to the actual benefits derived. There is no way of determining, now, how much each tract of land could be assessed, if the maximum amount would be the actual benefits derived, as that fact has not been legally determined.

The particular sections of the statute cited by defendant, and especially section 41-2562, relied upon, do not in any manner change this conclusion reached. Part of said section was originally found in chapter 16, 1913 Session Laws, amended by the legislature in 1919, chapter 20. Certainly the legislature did not intend by amending said section in 1919 to extend the right of assessment to the maximum limit of actual benefits accruing. Had the legislature so intended, knowing the construction that had been placed on the right of assessment, as laid down in *Elliott v. McCrea, supra,* language would have been used clearly stating such fact, and provision would have been made to have legally determined the specific amount of benefits actually accruing to each individual tract or lot of land.

Defendant also refers us to a number of decisions of other jurisdictions, which she contends support her view. Upon an examination of such cases cited, we find that in nearly every instance the case is based upon a specific statute of the state, providing specially that assessments may be made by the district to the maximum limit of the actual benefits accruing. One case cited by defendant seems to hold that implied power exists without express statutory authority therefor, namely, *In re Dancy Drainage Dist.,* 190 Wis. 327, 208 N. W. 479, 481, in which the court said:

"Since each individual owner of land cannot drain his own effectively, the law permits a number to act jointly as a *quasi* public corporation to drain a large area. And

thus a drainage district is formed in which all landowners therein become jointly interested and jointly bound. But the law is careful to place limits upon the liability of each owner by providing that it shall not exceed the amount assessed for benefits. It is equally careful to provide means for discharging the indebtedness of the district by requiring assessments to be made to meet it. There are at least two outstanding landmarks in the financial part of the drainage scheme, namely, that the liability of an owner of land therein cannot exceed his assessment for benefits, and the creation of a fund to pay the costs incurred, both principal and interest.

. . . . . . . . . . .

"Another fact must be borne in mind also, and that is that the bonds issued nearly up to the total assessment for construction, as they usually are because the district has no money except as it is raised by assessments, would not be salable in the market, for there would be no adequate margin of security. For these reasons, it is apparent that the legislative scheme, whether so in terms expressed or not, must have included the right to additional assessments up to the limit placed by the assessment of benefits for the payment of principal and interest due on lawful debts incurred by the district."

Again, said decision is distinguishable from the case at bar, in that the Wisconsin court based its holding upon the proposition that according to the legislative scheme of the Wisconsin law in force at the time, it was intended that such assessments were permissible, for the reason that otherwise the bonds would not be salable in the market, for there would be no adequate margin of security. That such was not the intention of the Idaho legislature seems certain, as section 41–2552, providing for the issuance of bonds, expressly makes provision for a margin of safety, in that the total amount of bonds to be issued shall in no instance exceed 90 per cent of the assessment levied against the lands of the district. This provision creating a margin of safety

was not found in the original act, but was provided for by amendment in 1919, chapter 183, sec. 11, Session Laws 1919.

Much stress has been placed upon this provision of our law providing a margin of safety by petitioners, they contending that by reason thereof all bondholders are fully and amply protected as to the full payment of all bonds issued, in that such 10 per cent margin is amply adequate to insure the payment of all bonds, even though some property owners default in the payment of their assessment, and even though property owners, at any time, were permitted to pay the assessment against their respective tracts of land in full, either by payment in cash or with bonds of the district, as provided by chapter 183, Session Laws 1933, which was not permissible under the law at the time when the bonds were issued. The wisdom of such legislation, providing that the total amount of the bonds shall not exceed 90 per cent of the total assessments levied against the lands of the district, as to whether the same was an adequate margin of safety, was for the legislature, and this court is not concerned. But we are not in accord with the contention, however, that by reason of the margin of safety provided for that the 1933 act does not impair the obligation of the contract, for the reasons heretofore pointed out.

Petitioners also contend that the organization and control of drainage districts is in the exercise of the police power of the state for the general welfare; that by article 11, section 8, Constitution of Idaho, the police power is specifically reserved, in that such power of the state shall never be abridged or construed as to permit corporations to conduct their business in such a manner as to infringe upon the equal rights of individuals, or the general well-being of the state; that a drainage district being thus created under the general police power of the state cannot contract so as to abridge the right of the state to exercise its police power in the interest of the general welfare, even by subsequent legislation so that the impairment of contracts cannot arise where the state is exercising its police power.

It is conceded by the parties that the bonds in question are contracts existing as between the land owners and the bondholders. Under the federal and state constitutional provisions above quoted, no law can ever be passed impairing the obligations of a contract, and no exception is made, consequently the contracts of a drainage district stand upon the same footing as those of individuals or any other agency. The legislature cannot, under such constitutional prohibitions, authorize under the police power of the state the creation of a contracting agency and permit the contracting of obligations, and by the same power destroy its contracts and abolish its obligations. To permit the legislature to do so would destroy the very essence of the constitutional prohibitions. Clearly such was never the intention of the framers of the Constitution. Were it otherwise no person would ever be safe to enter into a contract with public or *quasi*-public corporations, creatures of the law.

The case of *Sandpoint Water & Light Co. v. City of Sandpoint,* 31 Ida. 498, 173 Pac. 972, L. R. A. 1918F, 1106, does not support petitioners' position. The decision of the court in that case was, in substance, that there was no contract in existence, as between the parties, which was attempted to be impaired, rather than holding that the legislature could enact laws which would in fact impair the obligations of a contract.

Petitioners also contend that the principle of set-off is involved in this case and is applicable, in support of the act under consideration; that the petitioners are land owners within the drainage district, whose lands have been assessed for benefits and are therefore debtors to the district; that when they became the owners of the bonds of the district they also became creditors and, therefore, have the right to invoke the principle of set-off; that such right is supported by the supreme court of the United States in the case of *Amy v. Taxing District of Shelby County,* 114 U. S. 387, 5 Sup. Ct. 895, 29 L. ed. 172. Upon a careful analysis of that case, as well as the case of *Blount v. Windley,* 95 U. S. 173, 24 L. ed. 424, cited therein in support of the doctrine

of set-off, we fail to see how the law as laid down in said two cases is applicable in this case, under the particular facts and circumstances. In both of said cases the supreme court of the United States, in substance, held *that the extent to which mutual obligations may be set off against each other, when no rights of third parties interfere, is wholly within the scope of legislative action.* In each of said cases no rights of third parties were involved, and in the case of *Blount v. Windley, supra,* the court used this language:

"The idea of set-off is not the same as payment. It is the doctrine of bringing into the presence of each other the obl:gations of A to B and of B to A, and by the judicial action of the court make each obligation extinguish the other. And this process is applicable to any class of obligations which the legislative power of the State chooses to bring within its operation.

"That it is exercised in aid of justice when a bank of circulation is compelled to receive that circulation in satisfaction of debts due to it, whether they be in judgment or in any other form, can hardly be questioned, *if the rights of no one but the bank are affected by the Act.*

"*In what we have here said, we do not mean to be understood that, where the creditors of the bank have a right to have such a debt paid in lawful money, the Legislature can deprive them of that right; nor that in any other case, where the judgment creditor represents an interest in the contract, which has a right to demand its payment in lawful money, the State can authorize its payment in anything else.*

"In the case before us, if it appeared by the agreed facts on which the case was tried that there existed any creditors of the bank who had proved their debts as the law required, the case might have been different. But there is no evidence in this record that there was any other creditor of the bank in existence besides the defendant, when he made this motion for set-off." (Italics ours.)

Which law, as stated, if applied to the facts in this case absolutely forecloses the right of set-off.

Petitioners refer us to two states, namely, Utah and Oregon, which have enacted legislation similar or analogous to chapter 183, Session Laws 1933. The Utah act, which had reference to drainage districts, was before the supreme court of that state in *State v. Blake*, (Utah) 20 Pac. (2d) 871. However, the constitutionality of the statute was not raised or passed upon by the court in that case, consequently is not an authority here.

In the case of *Halderman v. City of Astoria*, 140 Or. 160, 13 Pac. (2d) 358, that court held to the effect that bonds may be accepted as payment of special assessment obligations when the law did not so provide at the time when the bonds were issued, but it appears that the bonds were also general obligations of the city. The court holding that the discharge of the special assessment by the surrender of the bond, as to the particular piece of property in question, gave the other bondholders a better security than they had before its discharge, which is an entirely different situation than that which we have before us.

The question has also arisen, and has been thoroughly presented, as to what effect, if any, chapter 218, 1921 Session Laws, and particularly section 8 thereof, has upon the respective rights of the parties with reference to the bonds in question. Section 8 of said act reads as follows:

"The certificate of the Treasurer of the State of Idaho, substantially in the form set out in Section 5 hereof, attached to or endorsed on any bond of an irrigation or drainage district, shall be conclusive evidence that such bond has been duly approved by said Reclamation District Bond Commissioner, and that it is eligible for certification under the provisions of this act and a valid and binding obligation of such district. *And the faith and credit of such district and all lands within the boundaries thereof are and must continue pledged for the payment of said bonds and interest thereon as the same become due.* Should the taxes for the payment of interest on any bonds certified under the provision of this act not be levied or collected in time to meet such payment, the interest must be paid out of any money

in the treasury of said district, and the money so used for such payment of interest must be repaid to the fund from which it was paid, out of the first moneys collected from taxes levied for the payment of interest.''

Of all the bonds issued by the drainage district but $44,000 were certified as provided in the act. That the original obligations of the district, for which the bonds were issued, is based upon special benefits is definitely established and the question arises: Can the legislature, by law, change such obligation into a general liability without violating constitutional provisions? We think not. It is conceded by the parties that the bonds in question are but limited obligations; the only difference as between the parties is the extent of such limited obligation, which has already been determined herein. It seems that the legislature undertook by chapter 218 to make irrigation and drainage district bonds, certified under its provisions, general obligations against the property within the districts. Such a law would impair the obligations of the contract, as to any bonds issued prior to its passage, in violation of the constitutional provisions heretofore cited. For in the first instance, the property owner was only liable to the extent of the assessment of benefits against his land, and to enlarge such liability so as to make his liability general would clearly impair the obligations of the contract, in violation of his constitutional rights.

Said act also violates article 8, section 3, of our state Constitution, which provides that, ''No county, city, town, township, board of education, or school district, or other subdivision of the state, shall incur any indebtedness, or liability, in any manner, or for any purpose, exceeding in that year, the income and revenue provided for it for such year, without the assent of two-thirds of the qualified electors thereof voting at an election to be held for that purpose,'' and also provides that provision be made for the payment of interest thereon and the principal thereof within 20 years from the date of contracting the same.

Drainage statutes and the right to issue bonds thereof are upheld on the theory of special benefits to the property owner within such districts. (*Elliott v. McCrea, supra.*) Any law attempting to change the obligation, based solely upon special benefits, into a general obligation would be contrary to the theory of the law permitting the obligation, and such general obligation could not be incurred without complying with art. 8, sec. 3, of the Constitution.

The conclusion is that said provision of the law attempting to make the bonds in question general obligations of the district is unconstitutional and void.

For the reasons herein announced, we hold that chapter 183, Session Laws 1933, impairs the obligations of the contract, as to the bonds in question, in violation of art. 1, sec. 10, Constitution of the United States, and art. 1, sec. 16, Constitution of Idaho. Therefore, the application of the petitioners for a writ of mandate is denied and the proceeding dismissed.

No costs allowed.

Budge, C. J., and Givens and Holden, JJ., concur.

MORGAN, J., Concurring.—I concur in the conclusion reached, and base my concurrence on that portion of the opinion which holds chapter 183, Session Laws 1933, to be violative of the obligations of contract if applied to the bond issues involved in this case.