[S. F. No. 15064.  In Bank.—April 25, 1935.]

E. C. SHOUSE, Petitioner, v. C. W. QUINLEY, as Collector, etc., Respondent.

Hankins & Hankins and A. L. Cowell for Petitioner.

Thomas C. Boone and Griffin & Boone for Respondent.

F. G. Athearn, Milton T. Farmer, Walter Hoffman and Louis Bartlett, as *Amici Curiae* on Behalf of Respondent.

THOMPSON, J.—We granted a rehearing in this case in order to give further consideration to the problem involved, particularly in connection with the cases of *County of Los Angeles* v. *Rockhold,* L. A. No. 14798, *ante,* p. 192 [44 Pac. (2d) 340], and *Islais Co., Ltd.,* v. *Matheson,* S. F. No. 15216, *post,* p. 657 [45 Pac. (2d) 326], S. F. No. 15217, *post,* p. 762 [45 Pac. (2d) 332], S. F. No. 15221, *post,* p. 763 [45 Pac. (2d) 332], and S. F. No. 15299, *post,* p. 764 [45 Pac. (2d) 333], and ▌S. F. No. 15222 [49 Pac. (2d) 821], *S. F. No. 15298 [45 Pac. (2d) 332], and *S. F. No. 15300 [45 Pac. (2d) 333]. Upon further consideration, however, we are satisfied with the correctness of the former opinion, which is as follows:

"This is a proceeding in *mandamus* to compel the collector of the Waterford Irrigation District to accept a credit memorandum, issued by the treasurer of the district in return for surrendered matured interest coupons on the bonds of the district, in payment of the second instalment of the 1932 assessment on petitioner's land in the district, to the extent that the assessment was levied to meet bond principal and bond interest.

"The amount of the tender was admitted to be as authorized by section 52a of the California Irrigation District Act (Deering's Gen. Laws, 1931, vol. 2, pp. 1948 et seq.), added by amendment in 1933 (Stats. 1933, p. 532), but was refused by the collector on the grounds that:

" (1) Section 52a is unconstitutional.

" (2) If valid, the tender was insufficient in that it attempted to pay by a credit memorandum of bond interest coupons the portion of the assessment levied for bond principal as well as that for bond interest.

" (3) The interest coupons represented by the credit tendered were not the first coupons registered and therefore cannot be accepted till all prior registered coupons are paid.

"The questioned section provides that, notwithstanding any other provisions of the act, 'any owner of land within the district who is the holder of any matured bond or interest coupon issued by the district, which bond or interest coupon remains unpaid by reason of insufficiency of money

. . . is authorized to apply the credit represented by such unpaid bond or coupon as a medium of exchange in the payment of assessments levied against the lands of such person in the manner hereinafter specified.

" 'Upon presentation and surrender to the treasurer of the district of such matured bonds or interest coupons, or both, the treasurer shall issue to the holder a memorandum in writing, in duplicate, indicating the amount of credit represented by such bonds or coupons, or both, to which such holder is entitled to apply on such assessments.

" 'The collector shall accept the credit memorandum in lieu of lawful money for that portion of the total assessment levied on the lands of the holder of such bonds or coupons equivalent to the amount of such assessment as was levied to pay the interest and maturing principal of the bonds of the district, together with penalties, interest and costs in case of delinquency. The balance of the assessment shall be paid in money. . . .

" 'The treasurer of the district shall accept such credit memoranda, to the extent that the same have been applied upon such assessment, as the equivalent of money. The treasurer shall thereupon cancel the bonds and coupons for which such credit was given if the entire amount of the credit memoranda has been applied to the payment of assessments and in the event that only a portion of the credit has been applied, then the treasurer shall indorse upon the face of such bond or coupon the fact that the same has been paid in part to the extent of the credit so applied. . . . '

"The respondent asserts that the section is in violation of section 16 of article I of the state Constitution and section 10 of article I of the federal Constitution. The former provides, among other things, that no 'law impairing the obligations of contracts shall ever be passed', and the latter that no state shall pass a law impairing the obligation of contracts.

"For our purposes it is sufficient to note that in 1919 and prior thereto the district had issued and sold the bonds which give rise to this controversy. Prior to the demand by petitioner upon the collector the district had made default in the payment of both principal and interest and matured bonds and interest coupons had been presented and registered for payment in the order of their presentation. It is not contended by petitioner that he is entitled to payment as being prior in time of presentation, but he stands

upon the letter of the law which permits the landowner who is the holder of any matured bond or interest coupon to pay his assessment (excepting the portion thereof assessed for maintenance) therewith. He does not dispute the proposition that there exists a contract between the district and the bondholder and that the provisions authorizing the bonds and providing for their payment at the time of their issuance constitute terms of the contract, but he says section 52a does not substantially postpone, obstruct or retard the enforcement of rights of the bondholder or lessen the value of his holdings.

''At the time of the issuance of the bonds the act provided that they should be paid from revenue derived from an annual assessment on the lands of the district (sec. 33) which the board of directors was required to levy annually in an amount sufficient to meet all matured and maturing bonds and coupons for that year (sec. 39); provided that the assessments should be paid into the treasury and apportioned to the different funds (sec. 39a); that the assessments were to be paid in gold and silver coin (changed in 1933 to 'lawful money') (sec. 41); that there should be three funds, bond fund, construction fund and general fund (in 1931 the first fund was divided into the bond principal fund and the bond interest fund) (sec. 67); and that upon presentation, a matured bond or interest coupon should be paid from the bond fund or, if money were not available, it should be registered and draw interest at 7 per cent [in 1931 this section was amended to provide for payment of bond principal from the bond principal fund and of interest coupons from the bond interest fund in harmony with changed section 67 (sec. 52)]. By the general terms of the act the bondholder had the right to have his bonds paid upon presentation if money were available and if not to have them registered and paid in the order of presentation. (*Bates* v. *McHenry*, 123 Cal. App. 81 [10 Pac. (2d) 1038].)

''It thus becomes apparent that the result of the questioned section is first of all to abrogate the law with respect to the order of payment. So changed, it is as though the law read: Landowners who are the owners or who become such by purchase or otherwise of matured bonds or interest coupons shall be entitled to payment in preference to or without regard to bonds or coupons which have matured and which have been presented and registered previously for payment. In the second place, in view of the only condition

of the section, to-wit: that the bonds or coupons shall be matured and be 'unpaid by reason of insufficiency of money', the result, regardless of the financial condition of the district, is to hold before the landowners, the source of the money with which the district makes payment, the temptation of withholding payment of assessments in order to bring about the named condition and a depreciated market for the bonds, which may then be purchased and used as a medium of payment at face value. The two results mentioned very obviously demonstrate that the nonlandowning bondholder would suffer a very severe change of his contract were it to be held that the section does not impinge upon the constitutional provision against the impairment of the obligation of contracts. It requires no argument to establish that time and method of payment are material and vital parts of the obligations of a contract. The books are full of authorities to this effect, of which we need only cite the following: *Hershey* v. *Cole,* 130 Cal. App. 683 [20 Pac. (2d) 972]; *Security Trust & Savings Bank* v. *City of Los Angeles,* 120 Cal. App. 518 [7 Pac. (2d) 1061]; *Welsh* v. *Cross,* 146 Cal. 621 [81 Pac. 229, 106 Am. St. Rep. 63, 2 Ann. Cas. 796]; *Chapman* v. *Jocelyn,* 182 Cal. 294 [187 Pac. 962]; *Jeffreys* v. *Point Richmond C. & L. Co.,* 202 Cal. 290 [260 Pac. 548].

"It is no answer to say, as does petitioner, that the postponement of time of payment is caused by conditions, and not by the act of the district in accepting bonds or coupons in payment of the assessment. The very statement of the argument refutes itself, because the bondholder next in order of presentation is entitled to be paid with the sums realized from the assessment for that purpose and not to be indefinitely postponed. Going one step further into the field of practical finance for the purpose of illustrating the seriousness of the impairment and, bearing in mind that confidence is the foundation upon which the superstructure of credit and prosperity is built, we may well query: how many bonds could have been sold to others than landowners had the questioned section with its incentive to default in the payment of assessments been a part of the law at the time the bonds were issued? Obviously, too, there is no merit in the suggestion of petitioner that the act affords a secondary market to the bondholder. What has been said

also disposes of the contention that the acceptance of the bonds in payment of the assessment retires the bond and gives the bondholder greater assurance that eventually his bond will be paid.

"Similar legislation has been condemned by the courts in the following cases: *In re Cranberry Creek Drainage Dist.*, 202 Wis. 64 [231 N. W. 588, 85 A. L. R. 242]; *Howard* v. *State*, 226 Ala. 215 [146 So. 414]; *State* v. *Cherry*, 188 Ark. 664 [67 S. W. (2d) 1024]; *Straus* v. *Ketchen*, 54 Idaho, 56 [28 Pac. (2d) 824]; *McNee* v. *Wall*, 4 Fed. Supp. 496; *Keefe* v. *City of St. Petersburg*, 5 Fed. Supp. 132; *Moore* v. *Branch*, 5 Fed. Supp. 1011.

"However, the petitioner argues that the legislation may be sustained upon the theory that it was designed to meet an emergency and hence its validity may be upheld upon the authority of *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398 [54 Sup. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481], and *Des Moines Joint Stock Land Bank* v. *Nordholm*, 217 Iowa, 1319 [253 N. W. 701]. The first of the two mentioned cases involved a statute of Minnesota which provided that 'only during the continuance of the emergency and in no event beyond May 1, 1935', the period of redemption might be extended by the application of the mortgagor to the court having jurisdiction of the foreclosure, for an order fixing the reasonable value of the income or the reasonable rental value of the property involved and directing him to pay all or a reasonable part thereof 'toward the payment of taxes, insurance, interest, mortgage or judgment indebtedness' at the times and in the manner to be fixed and determined. The act recited the emergency. It further provided that, in case of the failure of the mortgagor to pay the sums required by the order or the commission of waste by him, the period of redemption should expire thirty days thereafter. In sustaining the legislation against an attack upon the ground that the act infringed the provision of the federal Constitution forbidding states to pass laws impairing the obligations of contracts, a majority of the Supreme Court said (p. 242): 'The legislation was addressed to a legitimate end, that is, the legislation was not for the mere advantage of particular individuals but for the protection of a basic interest of society.' It also said: 'the relief afforded and justified by the emergency, in order not to contravene the constitutional provision could only be of a character appro-

priate to that emergency and could be granted only upon reasonable conditions'. In view of this last-quoted statement and in order to properly evaluate its significance, we also quote a passage which very shortly follows and which may be said to constitute the whole crux of the case. It reads: 'In the absence of legislation, courts of equity have exercised jurisdiction in suits for the foreclosure of mortgages to fix the time and terms of sale and to refuse to confirm sales upon equitable grounds where they were found to be unfair or inadequacy of price was so gross as to shock the conscience. The ''equity of redemption'' is the creature of equity. While courts of equity could not alter the legal effect of the forfeiture of the estate at common law on breach of condition, they succeeded, operating on the conscience of the mortgagee, in maintaining that it was unreasonable that he should retain for his own benefit what was intended as a mere security; that the breach of condition was in the nature of a penalty, which ought to be relieved against, and that the mortgagor had an equity to redeem on payment of principal, interest and costs, notwithstanding the forfeiture at law. This principle of equity was victorious against the strong opposition of the common-law judges, who thought that by ''the Growth of Equity on Equity the Heart of the Common Law is eaten out''. The equitable principle became firmly established and its application could not be frustrated even by the engagement of the debtor entered into at the time of the mortgage, the courts applying the equitable maxim ''once a mortgage, always a mortgage, and nothing but a mortgage''. Although the courts would have no authority to alter a statutory period of redemption, the legislation in question permits the courts to extend that period, within limits and upon equitable terms, thus providing a procedure and relief which are cognate to the historic exercise of the equitable jurisdiction.'

''Again the court said: 'The legislation is temporary in operation. It is limited to the exigency which called it forth. While the postponement of the period of redemption from the foreclosure sale is to May 1, 1935, that period may be reduced by the order of the court under the statute, in case of a change in circumstances, and the operation of the statute could not validly outlast the emergency or be so extended as virtually to destroy the contracts.' The Nord-

holm case, decided by the supreme court of Iowa, involved a similar statute and a similar result was reached by a divided court upon the authority of the Blaisdell case.

''We are not confronted by a similar question. The legislature did not with respect to the present legislation declare the emergency, nor did it purport to confine the act to the period of an emergency. In fact, legislation of a different character was adopted in 1933 (amendment to California District Securities Commission Act, Stats. 1933, p. 355), which, while declaring the existence and nature of the emergency and the necessity of exercising 'the police power of the state to preserve the public welfare', provided that when any district is in default on its bond principal or interest 'to the extent of not less than twenty per cent (20%) of the amount due' it shall become subject to the supervision of the California District Securities Commission which shall make an investigation of its affairs and which may approve the annual assessment only for such total amount as it will be reasonably possible for the lands in the district to pay 'without exceeding a delinquency of fifteen per cent'. A consideration of the fact of the declared emergency in the act just mentioned, together with other legislation avowedly designed to meet the exigencies of the times, and the entire absence of similar declaration with respect to the section under consideration, or limitation of its operation, is sufficient evidence that it was not intended solely as a measure to meet an emergency. In this connection it is enlightening to observe the comments of the United States Supreme Court in the case *W. B. Worthen Co.* v. *Thomas*, 292 U. S. 426 [54 Sup. Ct. 816, 78 L. Ed. 1344, 93 A. L. R. 173], upon its previous opinion in *Home Building & Loan Assn.* v. *Blaisdell*. We there read: 'We held that when the exercise of the reserved power of the state, in order to meet public need because of a pressing public disaster, relates to the enforcement of existing contracts, *that action must be limited by reasonable conditions appropriate to the emergency.* This is but the application of the familiar principle that the relief afforded must have reasonable relation to the legitimate end to which the state is entitled to direct its legislation. Accordingly, in the case of Blaisdell, we sustained the Minnesota mortgage moratorium law in the light of the *temporary and conditional relief* which the legislation granted. We found that relief to be

reasonable *from the standpoint of both mortgagor and mortgagee, and to be limited to the exigency to which the legislation was addressed.'* (Italics ours.)''

In a later case, that of *W. B. Worthen Co.* v. *Kavanaugh,* 295 U. S. 56 [55 Sup. Ct. 555, 79 L. Ed. 1298, 97 A. L. R. 905], No. 556, decided April 1, 1935, by the United States Supreme Court, this construction of the Blaisdell case was affirmed.

''Not only is there no attempt to confine or limit the act to the emergency, but also it does not consider the interest of the nonlandowning bondholder. It cannot be said of section 52a of the California Irrigation District Act, as was said in the Blaisdell case (p. 2437) : 'The relief afforded by the statute has regard to the interest of mortgagees as well as to the interest of mortgagors.' Petitioner's argument that the bondholder is credited with seven per cent interest after maturity and presentation falls short of the mark for the obvious reason that this right to be credited with an increased interest rate is one extended originally to all bondholders upon the maturity and presentation of their bonds and coupons, and has no bearing upon the right of the bondholders to payment in the order of the presentation of the bonds or coupons. In short the section attempts to extend a preference instead of considering the interests of all parties. In view of the absence of a declared legislative intent to adopt the section as an emergency measure, and of its failure to limit its operation to the exigency to which it is said to be directed, and of the fact that the section, in effect, is preferential rather than considerate of the interests of all parties, together with the further fact that the 'procedure and relief' here attempted to be extended are not, as they were in the Blaisdell case, 'cognate to the historic exercise of the equitable jurisdiction', it must follow that the legislation must fall under the reasoning of that case.

''This conclusion renders unnecessary any consideration of the other objections of respondent to the acceptance of the coupons in payment of assessments.''

The peremptory writ is denied.

Shenk, J., Curtis, J., Preston, J., Waste, C. J., and Seawell, J., concurred.