[Civ. No. 5194. Third Appellate District.—February 25, 1935.]

RIVER FARMS COMPANY OF CALIFORNIA (a Corporation), Petitioner, v. CALIFORNIA GIBSON, as County Treasurer, etc., Respondent; H. C. MORRIS et al., Interveners.

734

Devlin, Devlin & Diepenbrock for Petitioner.

Ralph W. Rutledge, District Attorney, for Respondent.

Dunn, White & Aitken, Athearn, Chandler & Farmer and Milton T. Farmer for Interveners.

W. H. Orrick and Orrick, Palmer & Dahlquist, as *Amici Curiae* on Behalf of Respondent.

PLUMMER, J.—No effort is made in this opinion to analyze all, or quote from the almost unlimited number of cases cited in the briefs, but only such general princip'es will be set forth and authorities cited as we deem necessary to a solution of the questions involved.

This cause is before us upon the application of the above-named petitioner for a writ of mandate directing the respondent, California Gibson, as Treasurer of the County of Colusa, and as Trustee of Reclamation District No. 108, to execute a deed of conveyance transferring and conveying to the petitioner a certain tract of land designated as tract No. 64 in assessment No. 5, levied upon the lands in said district covering said tract No. 64, containing about 22.40 acres. This proceeding is based upon the provisions of section 2 of the act of the legislature approved May 29, 1933, chapter 613, Statutes of 1933, page 1569, and in compliance with the provisions of the act just referred to the petition sets forth the prior ownership of the land described in the petition;

that during the time of the petitioner's ownership of the land, reclamation assessment No. 5 was levied upon the lands within the district covering the land belonging to the petitioner, upon which assessment No. 5 instalment calls have been made, which petitioner was unable to pay; that the instalments became delinquent, and subsequently thereto the respondent, as the treasurer of the county of Colusa, and acting as trustee for said district, offered the land and premises described in the petition for sale; that no bids or offers were made therefor, and the premises described in the petition were bid in for the benefit of the district, and not being redeemed, were subsequently conveyed to the district, and that the respondent, as treasurer of the county of Colusa, claims the title to the land described in the petition, as trustee for the district.

The petition further sets forth the amount of the instalment calls, and also the amount of money realized by the district as rentals received from said tract of land since its conveyance to the district, and the amount of money now due under the provisions of the act of the legislature referred to, entitling the petitioner to repurchase the land and premises described in the petition, and that on the sixteenth day of June, 1934, the petitioner did offer to purchase the parcel of land referred to herein and described in the petition, and tendered to the respondent the amount of money due thereon to entitle the petitioner to become the purchaser thereof; that the respondent refused to accept said money, and also refused to permit the petitioner to become the purchaser thereof, and refused to convey said land and premises to the petitioner.

The prayer of the petition is that the respondent be required to accept the petitioner's offer to purchase the premises described and known as "Tract No. 64", and execute a good and sufficient conveyance thereof to the petitioner.

The answers of the respondent and interveners admit the allegations of the petition, and raise only the question of the constitutionality of chapter 613, *supra*, section 2 of which reads as follows:

"During said period of two years from the effective date of this act, all rentals or moneys received from all lands leased or operated by the Board of Trustees of a Reclamation District shall be forthwith paid to the County Treas-

urer, as trustee of a reclamation district, less the actual and reasonable costs incident and necessary to operating and leasing of said lands, and shall be applied by such County Treasurer on account of the payment of all delinquent and unpaid installments of assessments levied and assessed against the particular tract of land from which the income is received, and accrued interest thereon; and during said period of two years from the effective date of this act, any person who was entitled to redeem said lands may purchase said lands at a private sale from the County Treasurer or the Reclamation District for the amount of all the delinquent and unpaid installments of assessment then owing upon said lands, less the amount of all penalties accrued as of the effective date of this act, but including all penalties hereafter accruing, together with interest upon said amount at the rate of seven per cent (7%) per annum from the date of the respective sales to the date of such purchase, and also less the amount credited upon said delinquent installments and interest received from all rentals, rents and receipts from the renting and operation of said land, as herein provided, which said purchase price may be paid in cash or in matured bonds or coupons thereof, of said district, issued upon said assessment, and upon the payment of such purchase price, the said County Treasurer shall execute to such purchaser upon such sale a deed conveying said property free of incumbrances, except the unpaid and uncalled balance of said assessment, and any other assessment of said District.'' Section 1 fixes the time and limits the persons who may exercise the right to purchase.

The dates of the occurrences mentioned in the petition bring the acts of the petitioner and the respondent within the terms and provisions of the act under consideration. The life of the act is limited, and no reference therein is made to the sections of the Political Code relating to the sale and disposition of lands upon which instalment calls on account of assessments have become delinquent, but being later in time, if constitutional, its provisions must be given effect. If violative of any constitutional provisions, no asserted emergency considerations can be considered as a basis for any decision herein.

The bonds of Reclamation District No. 108 were issued in the year 1925, pursuant to section 3480 of the Political

Code as it then read. A consideration of the questions to be answered in this cause necessitates first, a review of the legislation having to do with the bonds of reclamation districts, levying of assessments, calling of instalments, the sales of land allowed to go delinquent, and as well, the powers of the trustees of the district and county treasurer of the county in which the principal portion of the lands in the district are situate.

By an act of the legislature approved June 1, 1923 (Stats. 1923, chap. 287, sec. 3480, *supra*), after the portions of the section relating to elections, it is specified that if a majority of the votes cast at such election are in favor of the issuance of bonds, the board of trustees of the district shall cause bonds to be issued in amounts specified in the section, bearing interest at a rate not to exceed 6 per cent per annum, payable semiannually, the several bonds having coupons representing different or several instalments of interest. Following the provisions of the section relating to the sale by the county treasurer, as trustee, the section sets forth that ''All moneys collected by any County Treasurer upon any assessment upon which bonds have been issued, including all moneys derived from sale of land for delinquent installments, or from sale of lands bought by the Treasurer at any such sale, shall be by such Treasurer forthwith paid into the main county treasury, to the credit of the bond fund of such Reclamation District, and shall be used exclusively for the payment of principal and interest of said bonds issued on such assessment, and of the principal and interest of any refunding bonds issued thereon.''

By the terms of the section the lien of any unpaid assessment upon which bonds shall have been issued shall continue until all said bonds and any refunding bonds which may be issued shall have been paid in full. The section likewise specifies that if at the sale no one appears to purchase any of the several tracts upon which the assessment calls have become delinquent, the county treasurer shall, as trustee of the bond fund, purchase the tract or tracts for which no bids were received, issue a certificate therefor, and if no redemption is made within one year, execute a deed to himself as trustee of the bond fund, for all lands purchased as county treasurer and trustee of the bond fund, which have not been redeemed.

The section provides that no bid shall be received which is not equal to the delinquent instalment plus all penalties and interests due at the date of the sale. After any sale has been made, any person "interested in said property may redeem the same at any time within one year after the date of sale by paying to the County Treasurer for such purchase a sum equal to the purchase price stated in the certificate, with interest thereon at the rate of 12 per cent per annum from the date of sale to such redemption". "Any parcel of land bid in and purchased by the Treasurer, as trustee, of the bond fund of the district, may be sold and conveyed by him or his successor in office at any time after the expiration of the redemption period of one year, at public or private sale, and with or without notice, to any person paying him the amount for which said parcel was bid in by said Treasurer at delinquent sale, with interest thereon at the rate of 7 per cent per annum, compounded yearly from the date of said delinquent sale, and also the amount of all subsequent installments then delinquent, with accrued interest and penalties thereon." The section also provides that payment of the purchase price may be made in accrued bonds or accrued· interest coupons. Notice of sale is required to set forth the amount of the instalment; that the land be sold for the amount of the instalment; the amount of interest thereon; and penalty fixed at 20 per cent.

After particularly specifying and setting forth the powers and duties of the officers of the district relative to the making of call for instalment payments on account of the assessment, sale of lands, redemption of lands, etc., the final provision is as follows: "If any land so held by County Treasurer as trustee of the bond fund of a district shall remain unsold after the final instalment of the assessment shall have been collected by payment or sale, then such treasurer shall sell all said ·land so held by him at public auction to the highest bidder for cash,· upon two weeks published notice, and shall deposit the proceeds of such sale in the treasury of the main county to the credit of the bond fund of the district," etc.

By an act of the legislature approved May 12, 1931 (Stats. 1931, p. 762), section 3480 of the Political Code was amended so as to lessen the penalty imposed on account of delinquency sales, to 10 per cent of the unpaid instalments. The

section as amended, however, still provided "that all moneys collected by any County Treasurer upon any assessment upon which bonds shall have been issued, including all moneys derived from sale of land from delinquent installments, or from redemption thereof, or from sale of lands bought by the Treasurer at any such sale shall be by such Treasurer, forthwith paid into the main County Treasury . . . and shall be credited to the bond fund of the Reclamation District, and used exclusively for the payment of principal and interest of said bonds issued on such assessment, and of the principal and interest on any refunding bonds issued thereon".

The section as amended also provided that at any delinquent sale, if no one bid for any parcel of land upon which an instalment had been allowed to go delinquent, the treasurer should bid in the same, and finally, if not redeemed, execute to himself a deed for such lands as trustee of the district. Slightly different provisions are also made as to what taxes, assessments, etc., the lands would still be subject when sold to a purchaser, which, by reason of what we shall say hereafter, we do not deem material. The purchase price could still be made in accrued bonds or accrued interest coupons.

The section as amended likewise provided as follows: "Any parcel of land bid in and purchased by a Treasurer, as aforesaid, as trustee of the District, may be sold and conveyed by him, or his successors in office, at any time after the expiration of said redemption period of one year, at public or private sale, and with or without notice, to any person paying him the amount for which said parcel was bid in by said Treasurer at delinquent sale, with interest thereon at 7 per cent per annum, compounded yearly," etc.

In 1931 (Stats. 1931, p. 773), section 3466(a) of the Political Code was adopted. This section provides that after the lapse of one year from and after the expiration of the period of redemption of any lands sold in the district pursuant to the provisions of sections 3466, 3480 or section 3480(a), the county treasurer of the main county, when and as directed by the board of trustees of the district may, in their discretion (etc.), sell any land remaining unsold, to the highest bidder for cash, at the front door of the court-

house of the main county after giving notice of the time and place of sale, as provided for in the section.

It is further provided that the trustees of the district shall have the right to reject any and all bids, and no bids shall be accepted for an amount less than such price as shall be approved by them. It is further provided that no parcel shall be sold for an amount less than the fair market value thereof, which value is to be ascertained by the board of trustees. The section further provides for management and control of all parcels of land, deeds to which have been executed by the county treasurer to himself as trustee. After providing that certain expenses shall be paid out of the proceeds received from the management of said lands as rentals, or otherwise, the section specifies that: ''In the event said District shall be in default for interest or principal payments on any of said bonds issued by said District'' (any surplus remaining), ''be deposited in said County Treasury of the main County, to the credit of the bond fund of the District, an amount equal to the revenues derived from each tract by reason of the leasing, use or occupation thereof, less the incidental expenses of leasing and holding the same, shall be credited by the County Treasurer on the assessment lists against the delinquent charges on said tract''. The added section then contains the following: ''The provisions hereof shall apply to all lands heretofore sold for delinquency to a district or to the County Treasurer, as trustee, as well as to future sales under assessments heretofore, or hereafter to be, levied.''

As section 3480, *supra,* read at the time of the issuance of bonds by Reclamation District No. 108, no parcels of land bought by the treasurer, and deeded to himself as trustee of the bond fund, could be sold for a price less than the amount of the delinquent instalments, together with all interest and penalties due thereon, until after the collection of the final instalment. Then, power was given to sell all lands then held by the county treasurer as such trustee, at public auction to the highest bidder for cash. This provision appears to have been eliminated from section 3480, *supra,* by the act of May 12, 1931 (Stats. 1931, p. 762), section 3466(a), *supra,* added by Statutes of 1931, page 773, apparently being considered as sufficient in relation to the

sale of lands held by a district on and after the expiration of one year from the date of redemption.

 Section 3480, *supra*, as it read at the time of the issuance of bonds by Reclamation District No. 108, and also as amended in 1931, gave the county treasurer, as trustee either of the bond fund or as trustee of the district, power to sell, at public or private sale, only upon receiving a bid equal to an amount of the sum of all delinquent instalments, including interest and penalties. Section 3466(a), *supra*, gives to the trustees of the district the power to direct a sale of the lands held by the county treasurer as trustee of the district, any parcel of land, or in fact, all parcels of land upon the receipt of a price equal to the fair market value thereof.

The change in section 3480, *supra*, naming the county treasurer as trustee of the district instead of trustee of the bond fund, as the section originally read, we think, only a change in name and not in substance. All moneys received by the county treasurer for lands sold by him, whether acting as trustee of the bond fund or trustee of the district, were and are required to be deposited in the county treasury for the same purpose, to wit: To the credit of the bond fund, to be used for the payment of principal and interest, etc. This establishes, we think, conclusively, that the legislature intended no change in substance by simply changing the designation of the capacity in which the county treasurer should act. At all times he is acting for the same purpose, irrespective of his official title.

By the express terms of section 3480, *supra*, as amended in 1923, and also as amended in 1931, the county treasurer was made a trustee for a particular purpose, to wit: To hold the lands and sell the lands for the benefit of the bond fund. This was his duty, whether he acted under the title of trustee for the bond fund, or under the title of trustee for the district. In neither instance did he hold the title as owner, nor did the district, by reason of the change in the title of the county treasurer, become an owner of any of the lands deeded to the county treasurer as a trustee discharged from the trust obligation to see that the proceeds received from the disposition or management of the lands should be applied to the bond fund.

■ While a reclamation district is only a public agency or arm of the political organization of the state, and is performing only such functions, and endowed with such privileges and powers as may be accorded by the legislature, it acts only in the capacity of a trusteeship, and never as an absolute owner or holder of the title placed in its charge by any of the provisions of section 3480, *supra,* either as it read in 1923, or as it read after being amended in 1931.

■ That the lands purchased by the county treasurer and deeded to himself as trustee either of the bond fund or for the benefit of the district, constitute a trust for the benefit of the bondholders, seems to us explicitly stated in the terms used in section 3480, *supra,* as it originally read and as it now stands amended. All moneys collected by the treasurer, whether on account of instalments, penalties, interest or sale of lands, must be by him paid into the treasury for the benefit of the bondholders.

In the case of *Rohwer* v. *Gibson,* 126 Cal. App. 707 [14 Pac. (2d) 1051], this court had occasion to examine the capacity in which the county treasurer acted and the character of funds collected by him, and the language used in that opinion we think applicable here, to wit: "In the recent case of *Meyers et al.* v. *City of Idaho Falls et al.,* 52 Idaho, 81 [11 Pac. (2d) 626], the supreme court of Idaho, in considering the nature of the fund collected on account of special improvement assessments, held as follows: 'Under the statute the municipality has the power to levy the entire cost of each improvement in one assessment. Its officers chose, however, to issue bonds for a ten-year period. The bonds succeed to the lien of the original assessment, and the assessments thereafter levied and collected are a "trust fund pledged by law for the payment of the bonds". (*Jewell* v. *City of Superior,* (C. C. A.) 135 Fed. 19.) The only duty with which the city officials are charged is the levying of assessments and payment of the funds collected to the bondholders (*Moore* v. *City of Nampa,* [C. C. A.] 18 Fed. [2d] 860), and there is no contention that the city has not fulfilled its obligation in this connection. The deficiencies which exist have arisen because the owners of certain parcels of property within each district failed to pay their assessments and general taxes, and the property reverted to the county, freed of the liens of the bonds. It

follows, as hereinbefore stated, that the funds collected by the city by means of special assessments are trust funds, pledged to the payment of the bonds issued against each district. Public improvement bonds are instrumentalities for the spreading of local improvement assessments over a period of years, and the maintenance of the lien therefor against the property benefited. Assessments collected are public funds, impressed with a trust in favor of the bondholders. (*Jewell* v. *City of Superior, supra*).' In addition to the foregoing cases holding such moneys to be trust funds, we may also cite the following: *Conway* v. *City of Chicago*, 237 Ill. 128 [86 N. E. 619]; *Wells* v. *Village of Wilmette*, 193 Ill. App. 30; *People* v. *Flynn*, 265 Ill. 414 [106 N. E. 961].''

In the case of *State* v. *Board of Commrs. of Cascade County et al.*, 89 Mont. 37 [296 Pac. 1], the Supreme Court of Montana having before it the questions we are now considering, held as follows: ''It has been suggested by counsel for respondents that the county holds title to these lands as a trustee. While this matter is not directly before the court for determination, yet we observe in connection therewith that, when the county acquires these lands by tax deed on account of delinquent taxes and irrigation district assessments, it takes and holds such title as a trustee. The moneys derived from the sale of such lands are trust funds. The parties and entities interested in that fund are the school districts within the county, the county itself, the state to the extent of the taxes owing to it, the bondholders, and the holders of the debenture certificates. If the lands shall sell for an amount in excess of the taxes and assessments, then, after the payment of the general taxes, applying the well established rules of equity, the remainder of the money should be turned over to the irrigation district, provided that sum does not exceed the total amount which would have been assessed against these lands on account of the bonds, had such lands not been transferred by tax deed. Thus the bondholders would have received the full value of all of their security.''

The same case was again before the Supreme Court of Montana, 94 Mont. 394 [22 Pac. (2d) 811], and the former holding of the court was reaffirmed in the following language: ''But in view of the law it is the duty of the

county commissioners to apply for tax deeds to enable the county to sell the land and to apply the proceeds as directed by law. *State* v. *Board of County Commissioners,* 86 Mont. 595 [285 Pac. 932]. This is but one of the puzzles which may be expected to appear from time to time in the operation of Montana's maladroit irrigation law. However, the rationale of the law compels the conclusion that, when irrigation district lands are struck off of the county and under statutory direction debenture certificates have been issued therefor, the county becomes a trustee and never discharges its trust until the lands are redeemed from sale, or, if not, until it sells the lands and distributes the proceeds agreeably to equity. (*Cosman Case,* 74 Mont. 111 [238 Pac. 879, 40 A. L. R. 1344]; *Malott Case,* 89 Mont. 37 [296 Pac. 1].)''

The section of the code and the cases which we have just cited we think clearly establishes the following propositions: First, the trust consists of all moneys regularly paid upon instalment calls; second, all moneys derived from the sales of land on account of delinquencies, including all moneys received on account of redemptions therefrom; third, all moneys derived from the resale of lands purchased by the treasurer as trustee for the bond fund, or as trustee for the district; fourth, the land itself, or the *corpus* of all parcels or tracts bought in by the county treasurer, and subsequently deeded to himself under the title of trustee for the district.

As we have heretofore stated, the designation of the title of the county treasurer of the capacity in which he acts, and which he uses in conveying land to himself, must be held immaterial, as the land so purchased and conveyed to the county treasurer constitutes a trust fund for the benefit of the bondholders, as set forth in section 3480, *supra,* as it read at the time of the issuance of the bonds by Reclamation District No. 108. If the change in title or in the name of the capacity in which the county treasurer is directed to act constituted a change in substance, and shifted any of the benefits or security from the bondholders to the district, then such provision would run counter to section 10 of article I of the United States Constitution, and would necessarily have to be held void as a violation of the original contract.

The security for the repayment of the money borrowed by the district, through the formality of the sale of bonds, includes all four of the propositions which we have set forth herein. Upon first impression we were led to the conclusion that the lien established by section 3480, *supra,* extended only to the amount of the assessment. The security, however, for the payment of the indebtedness, as we have just shown, extends not only to the moneys collected by voluntary payment of instalment and sales of lands on account of delinquency, but also to the lands to which title finally passes to the county treasurer in his capacity as a trustee. This clearly appears from the following language taken from the section as it originally read: "If no bid is made for any parcel at such sale, equal to the amount of the installment delinquent thereon, with interest and penalty, the Treasurer shall bid in and sell such parcel to himself and his successor in office, as trustee of the bond fund of said District as purchaser for the amount of said installment, interest and penalty." It then provided that in the event of no redemption after the lapse of one year, the treasurer shall excute a deed conveying the land to himself, following which it is provided that all moneys collected must be paid into the bond fund, and then the treasurer is authorized to sell the land, being limited as to the price only as to the amount of the instalments, penalties, and interest chargeable against the land proposed to be sold. And further: In the event that followed the call for the final instalment on account of the assessment, any land is still held by the county treasurer in his capacity as a trustee, the same shall be sold, and the treasurer is directed and commanded to "deposit the proceeds of such sale in the Treasury of the main County to the credit of the bond fund of the District".

In *Cooper* v. *Gibson,* 133 Cal. App. 532 [24 Pac. (2d) 952], this court, in considering the nature and extent of the interest acquired by the county treasurer as trustee, said: "There seems to us a clear line of demarkation between the right of the District as to lands sold on account of a delinquent assessment, and lands sold by the District after it has acquired title thereto. When lands have been sold and conveyed to the District, and title thus vested unconditionally in the District, it seems to us clear that the District has a right to sell the land for the highest possible sum that can be

obtained for the same, and appropriate to his own use and purposes every dollar received from such sale.''

We may here add that as to the land bought by the county treasurer as trustee for the district it is his duty upon sale thereof to obtain the highest possible market value, we think the proposition indisputable that whenever a trustee makes sale of trust property, his duty is to sell the land for all that it is reasonably worth, which includes at least the fair market value if economic conditions of the sale are such as to prevent the obtaining of the highest possible market value. This is a legal duty which a trustee is obligated to perform for the benefit of those for whom the property is held in trust.

In the opinion of *Cooper* v. *Gibson, supra,* this court in its opinion further said: ''In determining the right of the District to moneys realized upon sales, the distinction must be clearly kept in mind between sales made following delinquent installments and sales made after title has become vested in the District or in the County Treasurer as trustee for the District. In one instance the District is entitled to have sale made for a specific purpose. In the other, to have sale made to obtain all the money possible.''

We may further add that section 3480, *supra,* sets forth the minimum price in giving authorization to the trustee to make sale of lands to which he holds the title as trustee, but there is no attempt to fix the maximum price.

Where redemption is made the rights and equities of the bondholder are satisfied by the payment of delinquent instalments, penalties, interest and costs, but where the title has passed to the county treasurer as trustee, and the rights of the particular land owner, the title to whose lands has thus passed to the trustee no longer exist, the equities and rights of the bondholders, and also the equities and rights of all the other land owners in the district go to the extent of having the lands sold for their full value, in the event the value exceeds the limitation fixed in the section, below which the county treasurer as trustee is inhibited from making sale. This full value, or fair market value, to use the phrase found in some of the opinions, can only be secured where the right to purchase is open and free, upon the same terms to all persons having the desire and the ability to make purchase. A limitation upon this right or

privilege, which must be free to all intending purchasers in order to obtain the fair market value for property about to be sold, is an infringement of the contract entered into between the district and the bondholders at the time of the sale and issuance of the bonds.

In *Hershey* v. *Cole,* 130 Cal. App. 683 [20 Pac. (2d) 972] this court had occasion to exhaustively review the cases establishing the principle that the law in existence at the time bonds were issued becomes a part of the contract, and thereafter cannot be changed without violating constitutional prohibitions. The authorities cited in that case are so numerous that reference thereto only need be made. We may, however, quote the following from the opinion in the case of *Straus* v. *Ketchen,* 54 Idaho, 56 [28 Pac. (2d) 824], to wit: "It is conceded by the parties that the bonds in question are contracts existing as between the land owners and the bondholders. Under the Federal and State constitutional provisions above quoted no law can ever be passed impairing the obligations of a contract, and no exception is made; consequently the contracts of a drainage district stand upon the same footing as those of individuals or any other agency. The legislature cannot under such constitutional prohibitions authorize, under the police power of the State, the creation of a contracting agency and permit the contracting of obligations, and by the same power destroy its contracts and abolish its obligations. To permit the legislature to do so would destroy the very essence of the constitutional prohibitions."

The law as it stood at the time of the issuance of bonds by Reclamation District No. 108 read into the contract the right to have sales made of all lands, the title to which should be acquired by the county treasurer as trustee, for not less than a certain sum, and likewise there was read into the contract the duty of the county treasurer as trustee to make sale of all of the lands to which he should acquire title as trustee, for not less than a certain sum, to wit, the amount of the delinquent instalments, penalties, interests and costs.

It is true that in the authorization given to the county treasurer to make sale, the legislature uses the word "may". This word, however, is not simply a permissive term. In the case of *County of Los Angeles* v. *State of*

*California,* 64 Cal. App. 290 [222 Pac. 153], this court quite exhaustively reviewed the authorities touching the proper interpretation to be given to the word "may". We there held as follows: "It thus appears that while the word 'may' is primarily and ordinarily a permissive term, and not peremptory, nevertheless, when the rights of the party or other persons (in this case, the State of California), are dependent upon the exercise of the power conferred, the word 'may' takes on the mandatory form, and that the performance of the act provided for is neither optional nor discretionary upon the person or officer designated and authorized to perform the act." That no action has been instituted to compel the performance of this duty cannot be considered as a bar to, or as a waiver of the obligation set forth in the code.

The terms of the contract being safeguarded by constitutional provisions, the attempt of the legislature in 1933 to change the terms thereof by fixing a definite price, irrespective of the market value of the lands held by the county treasurer as trustee for which the same shall be sold, must be held an infringement of the contractual obligations.

In *State* v. *Board of Commrs. of Cascade County, supra,* we find the following pertinent language: "At the time of the issuance of these bonds, the statute required that, upon the sale of these lands, the price obtained must be at least equal to the total of the assessments and general taxes, interest, and costs. Section 7246. For the reasons hereinafter set forth, the provisions of Section 7246 may be changed as to the price at which the land is sold without violating the obligations of the contract, provided that price is the reasonable market value of the land, but a change in the law which empowers the Board of County Commissioners to sell these lands at any price bidden therefor, regardless of whether the price is the reasonable market value of such lands or not, is so obviously violative of the obligations of the contract that no further comment is required. Included within the provisions of this act are all lands, title to which is taken by the county through tax deed. We hold that Chapter 162, Session Laws of 1929, is unconstitutional in so far as it applies to the disposition of lands located within an irrigation district and having outstanding unpaid bonds or debenture certificates, as here. As to this class of lands,

the act is unconstitutional. It is unconstitutional because the obligation of the contract with the bondholders is thereby impaired.''

While the liability of every land owner is only to pay the amount of the assessment against the lands owned by him, and also while the lien extends only to the assessment, this statement is applicable only while the title to the lands involved is held by the owner. As we have shown, when the ownership of the land has passed by the deed of conveyance thereof to the county treasurer as trustee, a different principle is involved, and the security given by the statute becomes the land itself which, for the benefit of the bond fund, cannot be sold by the county treasurer acting under section 3480, *supra*, for less than the minimum sum mentioned therein. Every land owner in the district, as well as the bondholders, is entitled to have the land sold for its full market value, as the proceeds thereof are required to be credited to the bond fund, and ''shall be used exclusively for the payment of principal and interest of said bonds issued on such assessment, and of the principal and interest of any refunding bonds issued thereon.''

That the lands sold by a county treasurer, the title to which has been acquired by him, when sold, go back into the taxing column and become liable for the payment of all subsequent instalment calls on account of the assessment, does not lessen the right of any of the parties interested, nor does it change the provisions of the contract existing between the bondholders and the district, to have the lands sold for at least the minimum price named in section 3480, *supra*, when the treasurer is acting thereunder.

While the lands, the title to which is held by the county treasurer as trustee, may not be said to become security for the entire assessment spread against all tracts of land within the district, yet the code provision expressly directs that all moneys received from the sale of such lands shall be paid into the bond fund and used for the purposes hereinabove stated.

It is true that none of the reclamation district acts give the bondholders a lien upon the lands of the district, or a right to look to the lands in the first instance, or the proceeds derived from sales thereof, other than as we have stated, and in this particular differ somewhat from the irri-

gation district laws of Montana which create a lien upon the lands within such district, in favor of the bondholders. This, however, does not lessen, or authorize the lessening of the security for the payment of the bonded indebtedness of the district, or permit a lessening of the security by a provision authorizing a diminishing of that security by the legislature.

By virtue of the fact that a reclamation district is simply an arm or agency of the state, all property owned by the district, as stated in the case of *People* v. *Sacramento Drainage District,* 155 Cal. 373 [103 Pac. 207], is considered as property of the state. This, however, does not include lands in the ownership of private individuals situate within the boundaries of the district, nor does it change the trust character of the title taken by the county treasurer when lands are bought in by the county treasurer on the failure of others to bid therefor upon default in payment of instalment calls. The state does not become the owner of the property as that term is usually understood. The property is taken in a trust capacity, and the agency created by the state is just as much bound by the law relating to trusteeships as a private individual would be, the purpose in both cases being the taking of the title for the purposes of executing the trust according to any contract that may have previously been executed. For this reason the statement in *Reclamation District No. 70* v. *Birks,* 159 Cal. 233 [113 Pac. 170], which is in substance as follows:—that the state has a right to sell its property, acquired through delinquent assessment sales, for a price which will satisfy in full all purported trusts in favor of the bondholders of the district,—is not applicable to the lands held in trust where the proceeds received therefrom are directed to be applied to a particular purpose.

The distinction must also be kept in mind, as we have pointed out, between property owned by the district, as was true in the Birks case, and lands held in a specified trust capacity. This distinction would necessarily have to be kept in view in considering the right of the state to remit penalties and forfeitures, and providing for redemption from sales without their payment, if that question were really before us for consideration.

 In support of the petitioner's contention that penalties, interest, costs, etc., are no part of the assessment, and no part of the funds which are required to be used in the payment of bonds or accrued interest coupons, even though the code provisions are that such items are to be credited to the bond fund, the cases of *State* v. *Butts,* 111 Fla. 630 [149 So. 746, 89 A. L. R. 946], and *Jones* v. *Williams,* 121 Tex. 94 [45 S. W. (2d) 130, 79 A. L. R. 983], are cited. On first impression these cases were considered as controlling. A further consideration leads to the conclusion that both cases are inapplicable to the questions tendered for our consideration.

In the Dowling case the questions tendered for consideration are succinctly stated in two paragraphs of the syllabi, to wit: "Statutes designed to facilitate adjustment and settlement of delinquent taxes through reasonable additional extensions, reductions, and privileges, and to encourage or to facilitate the redemption of lands covered by tax sales certificates held by the State until the initial redemption period has expired, upon condition that current and future taxes on the same land shall be assessed and duly paid, do not violate a constitutional requirement of uniform and equal rates of *ad valorem* taxation upon just valuations of all taxable property. A statute permitting bonds, and their matured interest coupons, of a county or taxing district thereunder, to be used in redeeming land sold to the State for unpaid taxes of certain years after the expiration of the original redemption period, does not deny the equal protection of the laws to taxpayers or creditors of counties or taxing districts." No question of the sale of lands after a deed had been executed conveying title appears to have been involved in that case. The privileges covered by the statute related to the extension of time for the redemption of lands where tax certificates had been issued and the period of redemption had expired.

No attempt appears to have been made by the statutes considered in the Dowling case to extend an exclusive privilege to any individual or class of individuals, to buy property held in trust, the title to which had become vested in any district or arm of the state.

In the case of *Jones* v. *Williams, supra,* the court holds, and apparently supported by abundant authority, that the

legislature has power to remit penalties for tax delinquencies, including the power to remit interest charges imposed by statute in respect to delinquent taxes. In the instant case, as we have said, the power of the legislature to remit penalties, interest and costs is not involved. We may admit that penalties, interests and costs are no part of the assessment, yet that it does not determine the issues presented. The penalties, forfeitures, interest and costs are simply referred to, and as well, whatever income may have been derived from the trust property in fixing a definite price for which land held by the district in its trust capacity, after having acquired the title thereto, shall be sold, irrespective of the market value of the land, or of the persons who may become, or who may be desirous of becoming purchasers thereof, or who, by reason of contractual relations, are entitled to have the land sold for its full market value, or as expressed in a case hereafter cited, sold for its fair market value. This does not involve any remission of penalties, forfeitures, etc., in order to induce a redemption of property where the rights of the former land holder had been foreclosed by the divestiture of title, but is only used as a measure of fixing a sale price.

Whether the legislature does or does not possess the power to remit penalties, interest and costs does not determine the power of the legislature to infringe upon the contract rights of those who look to the land for reimbursement for the moneys advanced by them in the purchase of bonds, enabling the district to carry out its reclamation projects.

That the Supreme Court of this state takes a somewhat different view of percentages, penalties, etc., appears by the language used in the case of *Long Beach City School District* v. *Payne,* 219 Cal. 598 [28 Pac. (2d) 663]. Among other things, it is there said: "If taxes are not paid before delinquency on December 5th and April 20th of each year, the percentages for delinquencies are added. These percentages are not penalties as that term is generally known in law. (*County of Los Angeles* v. *Ballarino,* 99 Cal. 593 [32 Pac. 581, 34 Pac. 329].) They are the means provided for obtaining the tax itself by presenting an inducement to make voluntary remission on or before the date fixed for that purpose." The court then goes on to hold and set forth the purposes for which the penalties may be distrib-

uted. A somewhat different question is also presented by reason of the fact that section 3480, *supra,* in effect pledges the penalties as a part of the security for the payment of the bonded indebtedness of the district by providing that the penalties shall be paid into the bond fund.

■ That the rents, issues and profits derived from trust properties follow the *corpus* and become a part of the trust funds is unquestioned, irrespective of the act of the legislature adding section 3466(a), *supra,* providing for the management of property, the title to which has become vested in the county treasurer for the benefit of the district, and the specifying therein of the application to be made of rents, issues and profits. (65 C. J., pp. 690, 691.)

■ This brings us to a consideration of section 3466(a), *supra.* That section provides, among other things: "That no parcel of land shall be sold for an amount less than the fair market value thereof, as such value shall be ascertained by the Board of Trustees. One or more parcels of such land may be included in the same notice and sold severally at the time and place set forth in the notice."

Though questioned by the interveners, the following excerpts taken from the case of *State* v. *Board of Commrs. of Cascade County, supra,* would seem to uphold the constitutionality of such a procedure. We quote therefrom as follows: "In the brief of counsel for the relators it is said: 'A law in force when the bonds were issued became a part of the contract with the bondholders, the same as though incorporated in the bonds.' That this is a correct statement of the law may not be denied. This rule is based upon the provision of Article 1, section 10 of the Federal Constitution, which provides in part: 'No State shall . . . pass any . . . law impairing the obligation of contracts.' In the case of *United States* v. *Quincy,* 4 Wall. 535, 550 [18 L. Ed. 403], the Supreme Court of the United States said: 'It is also settled that the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge, and enforcement.' In the same case it is further stated: 'It is competent for the States to change the form of the remedy, or to modify it otherwise, as they

may see fit, provided no substantial right secured by the contract is thereby impaired. No attempt has been made to fix definitely the line between alterations of the remedy, which are to be deemed legitimate, and those which, under the form of modifying the remedy, impair substantial rights. Every case must be determined upon its own circumstances.' See, also, *Louisiana* v. *New Orleans,* 102 U. S. 203 [26 L. Ed. 132]; *Louisiana* v. *New Orleans,* 215 U. S. 170 [30 Sup. Ct. 40, 54 L. Ed. 144]; *Seibert* v. *United States,* 122 U. S. 284 [7 Sup. Ct. 1190, 30 L. Ed. 1161]; *Moore* v. *Otis,* (C. C. A.) 275 Fed. 747; *Moore* v. *Gas Securities Co.,* (C. C. A.) 278 Fed. 111, 123; *Gibbons* v. *Hood River Irr. District,* 66 Or. 208 [133 Pac. 772]."

As said in the opinion just referred to, it is fair to assume that no purchaser could or can be found who is willing to pay more than the fair market price of the land offered for sale. If that is true, then no infringement would occur against any contractual rights. Such a sale, bringing the land back into the taxing column, would enhance rather than militate against the interest of the bondholders as well as the interest of the general public, and also every person interested in the financial condition of the district, no matter what the capacity. The same argument was made in the Cascade county case as is presented here, and that argument is fittingly answered by the following excerpt found in the opinion, to wit: "The respondents insist that the lands may not be sold for an amount less than the general taxes, else Section 6 of Article 12, and section 39 of Article 5 of the State Constitution, will be violated. These lands are not now subject to taxation, because owned by the county. If they may not be sold for an amount less than that represented by general taxes, then the very purpose of the constitution and of the statutes is rendered ineffective by keeping this property from the tax rolls of the county, and thus, in effect, exempting it from taxation. As is said in the case of *City of Beatrice* v. *Wright,* 72 Neb. 689 [101 N. W. 1039, 1043]: 'To say that such property cannot be sold for what it is worth in the markets, even though for a less sum than the assessments against it, is to defeat the very objects of taxation, and lead to results the Constitution itself sought to avoid. Unless the property can be sold for its market value the result would be to exempt the property

from all taxation for all time. This, of course, is an absurd result, and any construction leading thereto would be clearly inadmissible.' To the same effect is *Fox* v. *Wright,* 152 Cal. 59 [91 Pac. 1005], and *Chapman* v. *Zoberlein,* 152 Cal. 216 [92 Pac. 188]. The above decisions are based upon constitutional provisions substantially the same as that of our own, above mentioned.''

 While we hold that constitutional provisions prevent the legislature from fixing a price at which the lands may be sold, irrespective of the market value, and limiting the persons who may be allowed to make purchase infringes upon constitutional rights, this does not stand as a bar to the application of a principle necessary to protect and really advisable to be put into effect to conserve the interests of all concerned by meeting a condition brought about not by the act of man, but by a superior force called an economic condition, which lessens the market value of the security back of the bonds, and which may be resorted to to secure their payment. When the market value of the lands become less than the amount of the delinquencies, penalties, costs and forfeitures, it is only a verbal expression to say that the contract obligations have been changed by authorizing a sale at the fair market value, and thus bring the lands back into the taxing column, subject to payment of future instalments, etc. The substance of the operation has not been changed by reason of any act of the legislature authorizing such sale, but simply a recognition that a power superior to an act of the legislature has rendered the provisions of section 3480, *supra,* impossible of application. If the security of the bondholder has been lessened, it is by the operation of superior economic forces over which the legislature has no control. The recognition of a fact is not the creation of a fact; likewise, the recognition of a condition is not the creation of a condition.

By reason of what we have said we do not need to follow the argument of counsel relative to the classifications and the distinctions drawn in section 1 of chapter 613, *supra,* and that it gives a privilege to one, denied to another, as what we have said we think sufficiently covers that issue.

 That chapter 613, *supra,* is discriminatory we think must be conceded. The calculations in the record before us show that for the small tract of land applied for by the

petitioner he would be required to pay as the purchase price only the sum of $92, whereas one holding an obligation of the district, and not a former owner of the particular tract of land sought to be purchased would be required to pay approximately the sum of $167.

Again, one class of persons is given two years within which to exercise an option of making purchase without making any compensation for the privilege so accorded. On the other hand another class of persons interested in the financial condition of the district, by reason of holding its obligations, is absolutely prohibited from exercising the rights granted to such person under the provisions of section 3480, *supra*, as it originally read, and also as it now reads after being amended in 1931. This class of legislation has been condemned in the cases of *Hershey* v. *Cole, supra,* and *In re Cranberry Creek Drainage District (Jones* v. *Lavigne, County Treasurer),* 202 Wis. 64 [231 N. W. 588, 85 A. L. R. 242]. The police power of the state does not authorize any such discrimination. (*Straus* v. *Ketchen, supra.*) That legislation changing the obligations of the contract of an improvement district after the issuance of the obligation is ineffectual, is held in the recent case of *Dallas County Levee Imp. Dist.* v. *Rugel,* (Tex. Com. App.) 36 S. W. (2d) 188.

Our attention has not been called to, nor have we been able to find any authorities upholding the right of a trustee to make a selection of purchasers of trust property. The law relating to trusts as we read it requires a trustee, when making sale, to sell to the highest responsible bidder.

Instead of bringing the land back into the taxing column, the record before us would indicate that the provisions of chapter 613, *supra,* have had a contrary effect. It appears that the title to 17,613 acres of land lying within the exterior boundaries of the district, has passed to the county treasurer as trustee. Of this number of acres only one former land owner has made application to repurchase, and the tract applied for comprises less than 25 acres.

The suggestion that the title held by the county treasurer as trustee may be defective for the reason that prior delinquent sales were had under section 3480, *supra,* as amended in 1931, rather than as it read in 1923, is im-

material. If such is the case, an action to quiet title would be the proper remedy.

 Basing the argument upon the decision in the case of *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398 [54 Sup. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481], it is strongly contended that the provisions of chapter 613, *supra,* may be upheld as emergency legislation, and as such, within the police powers of the state. As we have heretofore pointed out, the police power of the state does not authorize the violation of any constitutional provisions. The economic condition of Reclamation District No. 108 has become such, and is such that everyone interested therein, whether as a land owner, or a bondholder, stands to suffer a great financial loss. The record shows that a considerable tract of land has been allowed to pass from private ownership to the ownership of the district. That indicates two facts. Such land owners have suffered great loss; also, that the holders of securities issued by the district have likewise had their securities greatly decreased in value. The man who owned the land has lost his title thereto, and the man who invested money in the bonds of the district in order to enable the district to reclaim the land, and in large measure gave it whatever value it ever had, apparently has lost the greater portion of his investment. Their rights are equal; they are both entitled to consideration. The apparent purpose of chapter 613, *supra,* is to bring their land back into private ownership and within the taxing column. To accomplish this purpose, as we have stated, the right to purchase must be made as free as possible, and inducements offered not simply to one class but to all classes. The granting of the privilege to one, and the denying it to another having equal, if not greater interests, cannot be said to be in furtherance of a purpose to put the lands back either into private ownership or into the taxing column.

The Blaisdell case to which we have referred does not grant any special privileges without requiring the yielding of compensation therefor. Again, there is a clear line of distinction between granting an extension of time to redeem land, or to withhold forfeiture through foreclosure proceedings by making compensation to the holder of the obligation, and legislation seeking to give one class of persons a special privilege of making purchase of trust property at a desig-

nated price, irrespective of its market value. In the one case contractual rights are only postponed in their execution; in the other they are absolutely set aside.

In order to make the legislation involved in this case compare with the holding of the court in the Blaisdell case, provision should only have been made for extending the time of redeeming from delinquent sales prior to the divestiture of title, upon making compensation to the district therefor. We say "compensation to the District" because compensation to the financial condition of the district inures to the benefit of those who have advanced money on the face of the obligations of the district theretofore issued.

The legislation which we are considering compares more closely with that passed upon by the court in the case of *Worthen* v. *Thomas*, 292 U. S. 426 [54 Sup. Ct. 816, 78 L. Ed. 1344, 93 A. L. R. 173]. In that case the legislature of Arkansas attempted to exempt from execution, absolutely, moneys received on account of life, sick, accident or disability insurance, irrespective of amount, and making such legislation retroactive. This act of the legislature was held void by reason of being in violation of the United States Constitution, even though passed as an emergency measure.

As held in the case of *State* v. *Board of Commrs. of Cascade Co., supra,* and as attempted to be provided for in section 3466(a), *supra,* the financial condition of the district might properly be enhanced without violating any constitutional provisions, by authorizing the county treasurer of the district to sell any or all lands held in trust at its fair market value, even though that value is less than the fixed price specified in chapter 613, *supra,* to anyone having the desire and ability to purchase. As set forth in the opinion in the Cascade case, the bondholder is entitled to the market value of the trust property, and to nothing more. As we have said, the fact that economic conditions have lessened that value would not render such sale void as an impairment of any contract. The opinion in the Cascade case would lead to the conclusion that the police powers of the state might properly be exercised in the interest of the state in the bringing of the property back into the taxing column by authorizing a sale of all lands held in trust, at its fair market value at either public or private sale, thus placing

the land where it would be subject to instalment payments on the unpaid portion of the reclamation assessment, and at the same time yielding to the holders of the obligation of the district the full value of the lands involved.

That an emergency exists and financial problems confront every reclamation district is undeniable. Such conditions and problems, however, do not justify the invasion of constitutional provisions.

From what we have set forth, without expressing any opinion upon the rights of the state to remit penalties, etc., which question is not strictly involved herein, we think the conclusion is unavoidable that chapter 613, *supra*, in its provisions violates section 10 of article I of the United States Constitution.

The writ is denied.

Pullen, P. J., and Thompson, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 27, 1935, and an application by petitioner to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 25, 1935.