[Civ. No. 7413. Third Dist. Mar. 31, 1948.]

THOMAS McCORMACK et al., Petitioners, v. RAY G. HOUSTON, as County Treasurer, etc., Respondent.

C. F. Metteer, Stephen W. Downey and Downey, Brand, Seymour & Rohwer for Petitioners.

John Quincy Brown, District Attorney, William A. Green, Assistant District Attorney, and Orrick, Dahlquist, Neff, Brown & Herrington for Respondent.

ADAMS, P. J.—Thomas McCormack and two others, constituting the Board of Trustees of Reclamation District No. 1000 (a public corporation), instituted this proceeding in behalf of the district, seeking a writ of mandate to compel Ray G. Houston, as County Treasurer and Ex-officio Trustee of the district, to transfer a portion of the moneys now in two certain designated Reserve Funds to the Bond Interest and Bond Principal Fund of said district.

The petition is submitted on a statement of the case agreed to by counsel for the respective parties, and therefrom the following facts appear. From time to time, beginning in January, 1913, the district had issued bonds, the aggregate amount of which, outstanding as of July 19, 1934, together with unpaid interest, was $2,364,204.73. In January, 1934, for the purpose of refinancing this outstanding indebtedness, the trustees applied to the United States Reconstruction Finance Corporation, hereinafter referred to as R.F.C., for a loan, pursuant to the provisions of section 36, part 4, of the Emergency Farm Mortgage Act of 1933, as amended. On May 7, 1934, the R.F.C. agreed to grant a loan in the amount of $1,609,000, which represented approximately 70 cents on the dollar of the then existing bonded indebtedness of the dis-

trict, and agreed to take new refunding bonds in that amount in lieu of the old bonds. However, the resolution of the directors of R.F.C. granting the loan, which resolution was dated May 7, 1934, provided, as a condition of the making of the loan, that "so long as any of the New Bonds or any of the Old Securities pledged with or acquired by this Corporation remain outstanding" the district shall "provide for building up such suitable reserves *as may be required by this Corporation* for payment of principal and interest in bad years." (Italics added.) It also provided that "All resolutions and agreements by the District shall provide that any consents that may be given by and any rights thereby conferred upon this Corporation may be exercised by any successor to this Corporation designated by Act of Congress or by any Department of the United States Government or any corporation wholly owned by it, or by any person holding responsible office under the United States Government that may at any time be designated for that purpose by this Corporation."

On May 26, 1934, the board of trustees of the district adopted a resolution accepting the loan from the R.F.C., agreeing and assenting to all of the terms and conditions of the resolution of the directors of R.F.C., and agreeing to do and perform all things on its part to be done thereunder.

On July 19, 1934, the district held a bond election and authorized the issuance of bonds in the amount of $1,609,000, which bonds were designated as "refunding bonds of 1934." On July 27, 1934, the board adopted a resolution which provided that the authorized bonds should be issued in two divisions, designated as "First Division" and "Second Division," and provided the form of such bonds which was that the district promised to pay to the holder the sum specified, with interest at 4 per cent, and that they were to be secured by an assessment levied on the lands in the district. They were thus issued, and dated July 1, 1934.

On or about August 7, 1934, the R.F.C. advised the district by telegram that it would be necessary to set up reserves for this district on the same plan as adopted by the Pescadero Reclamation District, which plan did not involve setting up reserve funds but provided for the execution of a trust agreement escrowing certain of the outstanding bonds.

In 1937, before the actual conclusion of the negotiations with R.F.C., the district, being in doubt as to whether or not it was empowered under existing law to set up reserves as required by R.F.C., took steps to secure the enactment of

legislation granting that power; and in 1937, section 3480e of the Political Code was enacted. That section, which took effect June 22, 1937, provides, among other things, that whenever (a) an agreement shall have been entered into between any reclamation district and the United States of America or any department or agency thereof, for the refunding of bonds of such district and for the creation of a reserve fund for the purpose of paying installments of principal or interest of such refunding bonds whenever, by reason of delinquencies in the payment of calls or otherwise, the amount in the bond fund is insufficient to pay such installments, and (b) the unpaid principal amount of the assessment or assessments securing the outstanding bonds to be refunded is, or upon the carrying out of the plan will be, in excess of the principal amount of the bonds secured by such assessment or assessments and then outstanding, the board of trustees *may,* by resolution, declare that such excess (or part thereof) of the assessment or assessments shall be called from time to time for the purpose of creating a reserve fund; that the moneys in such reserve fund shall be used for the purpose of paying installments of principal and interest, or either thereof, of any outstanding bonds secured by such assessment or assessments, whenever by reason of delinquencies in the payment of calls *or otherwise* the amount in the bond fund shall be insufficient to meet such installments of principal and interest, or either thereof, on any January 1st or July 1st as the case may be; that if there shall be on hand in the bond fund a sum derived from an assessment or assessments upon which said bonds so to be refunded have been issued, which sum is in excess of the amount required for the payment of all installments of principal and interest due or to become due within six months upon all bonds secured by such assessment or assessments and then outstanding, the board of trustees *may* by resolution direct that such excess of the bond fund, or such part thereof as they shall deem advisable, be set apart for the creating of a reserve fund for the purposes above stated. The section also provides that whenever the reserve fund shall be depleted in whole or in part by reason of payments made therefrom, the county treasurer shall call such part of the principal of such assessment or assessments (not exceeding, however, the amount by which the unpaid principal amount of such assessment or assessments should be in excess of the principal amount of bonds secured thereby), as may be necessary in order to restore such depletion.

From time to time the R.F.C. had extended the time for completion of the closing of its loan to the district, and in the meantime it had proceeded to purchase the outstanding bonds of the district by payment to the holders thereof of 70 per cent of the principal amount thereof; and by June 28, 1937, it had acquired practically all of such outstanding bonds in the amount of $2,262,044.40. It then proposed to close the loan by exchanging the bonds which it had acquired for the refunding bonds of the district in the sum of $1,583,500. This was done on June 28, 1937. On July 8, 1937, the trustees adopted a resolution which recited that pursuant to authority conferred by sections 3480e and 3480f of the Political Code there was created in the office of the county treasurer of the county of Sacramento, two reserve funds to be known as "First Division Reserve Fund" and "Second Division Reserve Fund"; and the county treasurer was "authorized, empowered and directed to maintain in said respective reserve funds at all times, so long as any of said 'Refunding Bonds of 1934' shall remain outstanding and unpaid, an amount in cash, or in principal amount of bonds of the United States or of the State of California, the aggregate principal amount of which shall be a sum not less than the amount of the next ensuing maturities of principal and interest payable pursuant to the terms of said 'REFUNDING BONDS OF 1934—FIRST DIVISION,' and 'REFUNDING BONDS OF 1934—SECOND DIVISION,' respectively, and if, at any time, said reserve funds, or either thereof, shall become depleted in whole or in part, and other funds are not available in District's respective bond funds with which to replenish such reserve funds, as hereinafter provided, then the said County Treasurer shall call such part of the principal of such assessment or assessments, or of any interest accrued thereon, (not exceeding, however, the amount by which the unpaid principal amount of such assessment or assessments shall be in excess of the principal amount of the bonds secured thereby) as may be necessary in order to restore such depletion." This resolution was amended on August 2, 1938, but the provisions above set forth were not changed in any respect material here.

On April 3, 1945, the R.F.C. sold the refunding bonds then in its possession which by that time had been reduced to the principal amount of $1,357,000, to certain underwriters. It is recited in the agreed statement before us that in the course of their negotiations with the R.F.C. for the purchase of said bonds the underwriters consulted with the secretary of the

district and were advised by him that the reserve funds created by resolutions of the board of trustees had been established; and that in addition to moneys held in the reserve funds in the office of the county treasurer, $50,000 was held in the Federal Reserve Bank of San Francisco belonging to such reserve funds. Also the agreement sets forth a letter written by C. F. Metteer, secretary of the district, on April 13, 1945, after the sale of the bonds by R.F.C., to the attorneys for the underwriters, which contains a memorandum reciting the history of the transactions with R.F.C., the status of the reserve funds, the previous resolutions of the trustees of the district, etc., and which contains a statement that ''The Trustees and the Treasurer will, of course, pursuant to the Statute, maintain at all times, the proper reserve in the office of the County Treasurer.'' Also the statement recites that the county treasurer exhibited to the underwriters the books in his office as showing $73,611.13 then in the two reserve funds.

In due time after the sale of said bonds by the R.F.C., its relationship with the district was terminated.

On September 6, 1946, the trustees of the district passed a resolution providing that approximately $15,000 of the reserve funds, then aggregating in excess of $86,000, should be transferred to the bond funds to be applied to the payment of the interest on the refunding bonds to become due January 1, 1947, in order to bring the amount in the bond funds up to the necessary amount, and the county treasurer was directed to transfer said sum from the respective reserve funds to the respective bond funds, thus obviating the necessity for making assessment calls for said purposes.

Respondent county treasurer refused to make such transfer, and proceeded to make a call upon the assessments for the payment of interest to become due January 1, 1947. His reasons for so refusing, as set forth in the statement before us, are (1) that the reserve funds were established for the benefit of the holders of the refunding bonds ''so long as the same should be outstanding and unpaid,'' and that they cannot be dissolved without the consent of the owners and holders of all outstanding bonds ''without impairing the obligation of the contract expressed in the proceedings for the issuance of said bonds''; (2) that the county treasurer is trustee of the bond funds of the district, that the reserve funds must be held in trust by him ''so long as any of the Refunding Bonds of 1934 are issued and outstanding,'' and that a transfer

of *any* moneys from the reserve funds for payment of principal or interest in lieu of calls upon the assessments would constitute a breach of trust and subject him to liability; and (3) that the owners and holders of such outstanding bonds have threatened such liability upon respondent.

The position of petitioners is that the reserve funds were set up for the benefit of, and pursuant to their contract with R.F.C., which required the setting up of a reserve before the loan could or would be made by the R.F.C.; that their contract with the R.F.C. was not assignable to private parties, and, furthermore, was not assigned, and that the present bondholders cannot take advantage of its provisions. They argue that prior to the enactment of section 3480e of the Political Code a reclamation district had no power to set up reserve funds, and that said section was enacted for and intended only for the benefit of the United States or some department or agency thereof.

Respondent argues that the reserve funds are not limited to the benefit of the original holders—the R.F.C.—merely because section 3480e describes certain conditions upon the establishment of such reserve funds; that the district by its own proceedings established the reserve funds for the benefit of its refunding bonds as long as they remained outstanding and unpaid; that the obligation of what he designates as the "bond contract" (as distinguished from the contract between the district and the R.F.C.) continues so long as the refunding bonds are outstanding and that the district so intended at the time the refunding bonds were issued; that the said bonds are negotiable and carry with them "all the rights and security inherent in the bonds at the time of their issuance"; that the said bonds on their face refer to and incorporate the reserve funds as part of the obligation of the bond contract, and a practical construction of that contract by the district demonstrates that the reserve funds were established for the benefit of the holders throughout the life of such bonds; that the Legislature has validated the bonds in favor of the holders thereof; and that the resolution of the district purporting "to dissolve" the reserve funds impairs the obligation of the "bond contract."

Respondent does not contend that the present bondholders succeeded to any of the rights of R.F.C. under the contract between R.F.C. and the district. He distinguishes between

that contract and what he refers to as the "bond contract" and relies solely upon the latter. This necessitates a consideration of what the bond contract really is. Respondent is somewhat vague about this.

 It is stated in 21 California Jurisprudence, page 1044, section 18, that the rights of bondholders "are measured by the statute or other law by virtue of which the bonds were issued." This principle is enunciated in such cases as *Kendall* v. *Porter,* 120 Cal. 106 [45 P. 333, 52 P. 143], *Boskowitz* v. *Thompson,* 144 Cal. 724, 730 [78 P. 290]; *Bates* v. *Gerber,* 82 Cal. 550, 552 [22 P. 1115].

In *Hershey* v. *Cole,* 130 Cal.App. 683, at page 688 [20 P.2d 972], the court quoted from *Rorick* v. *Board of Commissioners,* 57 F.2d 1048, to the effect that "Legislation by authority of which bonds are issued, and their payment provided for, becomes a constituent part of the contract with the bondholders." In the Hershey case it was also said at page 695: "It also appears to be well settled that the law in force under which bonds are issued, enters into and becomes a part of the contract." And the court there gave approval to the contention of petitioners that "The land owner's part of the agreement is that by virtue of the issuance of bonds he obligates himself to pay the assessment in ten equal annual payments, with such additional percentage as may be necessary to cover delinquencies; that his part of the obligation is thereby fixed, and that it can neither be limited nor increased during the lifetime of the bonds for the issuance of which he has voted. On the other hand, that the purchaser of the bonds, based upon the assessment, accepts the bond based upon the premises which we have stated, and his right is to have collected from each land owner the annual percentage of the assessment as specified in the bond—no more and no less."

Also see *River Farms Co.* v. *Gibson,* 4 Cal. App.2d 731, 749 [42 P.2d 95]; *Islais Co., Ltd.* v. *Matheson,* 3 Cal.2d 657, 662, 666 [45 P.2d 326]; *Chapman* v. *Jocelyn,* 182 Cal. 294, 297 [187 P. 962].

The obligation of the district as recited in the bonds themselves is to pay the amounts specified at the time and place specified, with interest at 4 per cent. They also recite that they were issued pursuant to section 3480a of the Political Code, and that they are "secured by an assessment levied upon the lands of the district." Section 3480a, under which

the bonds were authorized and issued, and which under the foregoing authorities became a part of the contract between the landowners and the bondholders, contained no provision for a reserve fund; and even though, as contended by respondent but which we need not decide, it did not exclude the setting up of such reserves, it did not require, nor give to the bondholders any right to demand that such reserves be established. Therefore it cannot be said that the bonds *on their face* refer to the reserve funds; nor can it be said that the law in effect at the time of their issue had the effect of attaching to the bonds as a part of the contract thereof, any right to have reserve funds which right did not exist at the time of their issuance. It would seem to follow, then, that if the bonds now carry with them, or if the present bondholders have, a right to have the reserve funds continued intact, that right must have attached to the bonds subsequent to their issuance, or the present bondholders must have acquired such rights subsequent thereto, either by virtue of the subsequent enactment of sections 3480e and 3480f and the passage of the subsequent resolutions, or from the contract between the R.F.C. and the district. But, as formerly stated, respondent does not contend that any of the rights which R.F.C. acquired under their contract were assigned to them. In the course of the oral argument before this court counsel for respondent said: ''We are not resting our case upon any rights granted to the R.F.C. as such. We are resting our case upon our rights as bondholders *expressed* in the obligations of the bond. . . . We claim impairment of the contract by the district in attempting to dissolve the reserve fund set up for the benefit of the bondholders and equally for the landowners.'' (Italics added.)' Also in his brief respondent states: ''. . . Respondent claims no rights under the R.F.C. loan agreement as such. Respondent's rights and duties are predicated upon the obligation of the *bond contract which came into existence when the Refunding Bonds of the District were issued.''* (Italics added.)

But if the bonds when issued neither expressed nor carried with them any right to have reserve funds set up, then, though such reserves were thereafter set up in order to satisfy the demands of and to secure the loan from the R.F.C., and if respondent does not claim that the present bondholders succeeded to the contract rights of the R.F.C., what the district

did in setting up the reserve funds after the issuance of the bonds appears to be, as far as present bondholders are concerned, a mere gratuity which the district is at liberty to discontinue if the rights inherent in the bonds at the time of their issuance are not thereby impaired.

In *Kentfield* v. *Reclamation Board,* 137 Cal.App. 675, 681 [31 P.2d 431], the court said:

"The law is well settled that warrants, bonds and contracts of reclamation districts have written into them the law existing at the date of the issuance of such warrants, bonds or contracts. This court had occasion to consider this question, and went into the subject quite extensively in the case of *Hershey* v. *Cole,* 130 Cal.App. 683 [20 P.2d 972], and need only call attention to the cases there cited.

"It necessarily follows that the repeal of the act of 1927 directing the issuance of installment calls in the sum of three and one-half per cent did not in anywise affect the rights of warrant holders. When the legislature directed the reclamation board to make calls in the amounts stated, it gave an additional remedy to the warrant holders, which constituted no part of their contract, and not being a part of the contract, the direction to the reclamation board of the state might be withdrawn at any time."

In *McLaughlin* v. *Department of W. & P.,* 18 Cal.App.2d 41, 44 [62 P.2d 1402], bonds issued under the Municipal Improvement District Act of 1915 provided that the principal and interest of such bonds were payable out of taxes levied upon the taxable property in the particular district. After bonds were issued by Municipal Improvement District No. 35, located in the city of Los Angeles, the city adopted an amendment of its charter, section 223, which provided that the board of water and power commissioners should apportion from the revenue funds in the city treasury an amount sufficient to pay sums due on said bonds. Thereafter the charter was further amended to make it discretionary with the board to allocate revenue funds for the payment of bonds. Petitioner, who was the owner of some of the bonds, thereafter sought to compel the board to apportion out of the revenue funds of the city amounts sufficient to pay sums which had become due on the bonds held by him. The court said:

"Plaintiff contends that section 223 gave him 'additional security' for the payment of the bonds and argues that the provisions of the section 'became an integral part of the con-

tract of the bonds.' We cannot take this view. The bonds established the contract between the taxpayers in the improvement district and the holders of the bonds, a contract which embraced as one of its component parts the existing laws providing for the issuance of the bonds and for the manner of their enforcement. (*Hershey* v. *Cole,* 130 Cal.App. 683 [20 P.2d 972] ; *Chapman* v. *Jocelyn,* 182 Cal. 294 [187 P. 962].) If the argument advanced by plaintiff is to be sustained it must be held that the giving of the 'additional security' to the bondholders was a gratuitous act on the part of the city, which did not become a part of the contract. No vested rights were given plaintiff by section 223 of the charter. If the people had the right to thus provide additional security for the bondholders they had the right to remove such additional security. If in fact such security was given it was effectively removed by the charter amendment of 1927, by which discretion in the matter of the apportionment of funds was reposed in the board of water and power commissioners.''

As hereinbefore stated, the said bonds on their faces make no reference to reserve funds and they were authorized by the electors of the district in July, 1934, issued that same month, and dated July 1st of that year. It is therefore apparent that they were voted and issued under the statute then in effect, to wit, section 3480a, *supra,* and long prior to the enactment of sections 3480e and 3480f of the Political Code in 1937, and prior to the adoption of the resolution of the trustees establishing the reserve funds, on July 8, 1937. Respondent argues that the bonds were negotiable, that their transfer carried the security with them as an incident thereto, that the purpose of the reserve funds was to enhance the marketability of the bonds; that contractual rights are transferable. But a recitation of these legal precepts does not establish that the bonds were actually secured by the reserve funds which were set up after their issuance, and even after their delivery to R.F.C., so as to constitute them a part of the bond contract between the present bondholders and the landowners; and the law in existence at the time of issuance, even though it might have permitted a district to set up reserve funds (which petitioners deny) and though, as respondent's counsel argue, section 3480e does not limit the benefit of reserve funds to the benefit of the original holder, it still has not been pointed out by respondent how the events subsequent to the issuance of the bonds, that is, the enactment of sections

3480e and 3480f, and the establishment of the reserve funds in order to effect the consummation of the contract between R.F.C. and the district, can be said to have become a part of the contract of the bond itself. The statute did not compel the setting up of reserves, but merely empowered the district to establish them.

Respondent argues that the district by its own proceedings established the reserve funds for the benefit of the refunding bonds so long as they remain outstanding and unpaid. He also argues that the district intended at the time the bonds were issued that the reserve funds were to inure to the benefit of such bonds as long as they were outstanding, and that such intention was evidenced by the fact that calls were made in 1945 and in April, 1946, while there were moneys in the reserve funds more than sufficient to pay all of the principal and interest requirements to become due thus evidencing their own construction of the "bond contract," and that that "conclusively establishes that the Reserve Funds run throughout the life of the Refunding Bonds for the benefit of their owners and holders." And while it is true as a general rule that where a contract is ambiguous in its terms the conduct of the parties under it is persuasive in arriving at an understanding of its meaning, such rule presupposes the existence of a contract and an ambiguity in its language; and respondent has not yet shown any contract between the landowners and the present bondholders to establish and maintain reserve funds for their benefit or any ambiguity in the language in the bonds. The only contract shown is that appearing upon the face of the bonds themselves, and, of course, provided by the law under which they were issued which became a part thereof.

Respondent does not argue that the district or its trustees are estopped by their conduct from discontinuing the reserve funds, or that the present holders bought the bonds in reliance upon anything done by the district, though some of the elements of an estoppel are squinted at in his brief. He rests his case upon the proposition that there is a contract between the present bondholders and the district which binds the latter to continue the maintenance of the reserve fund, and this though the bonds do not so specify, and the law in existence when the bonds were authorized and issued did not so require, and though it is not even claimed that if the reserve funds are applied to the purpose for which the district now

intends to apply them, the security of the bonds will be threatened or that the surplus assessment will not be sufficient to take care of principal and interest as they mature. Petitioners point out that there exists a surplus assessment of $684,844.40 over and above the outstanding bonds, which exists by reason of the fact that the old bonds amounted on their face to $2,268,344.40, while the refunding bonds were issued in the amount of $1,583,500, and had been reduced when the present bondholders acquired them, which constitutes ample security far and above the amount of the refunding bonds outstanding. Furthermore, it is stated by petitioners in their closing brief that it is not purposed to use the reserve funds for other than the purposes for which they are held, to wit, the payment of principal and interest on the refunding bonds, and petitioners agree that any writ of mandate issued by this court may so provide.

Respondent also argues that in 1939, and thereafter, at least four validating acts were passed by the Legislature and that such acts validated the proceedings establishing the reserve funds in favor of the holders of the refunding bonds; and he quotes from said acts the provisions that ''All acts and proceedings heretofore taken by any public body under any law, or under color of any law, for the issuance, sale, or exchange of bonds of any such public body for any public purpose are hereby confirmed, validated, and declared legally effective.'' . . . ''All such bonds heretofore issued, or heretofore authorized to be issued when hereafter issued in substantially the form contemplated in such authorization, shall be, in the form and manner in which issued and delivered, the legal, valid and binding obligations of the public body.'' But he fails to point out that such acts also provide that they ''shall be limited to the correction of defects, irregularities, and ministerial errors which the Legislature originally could have omitted from the statutory requirements of the law under which such acts or proceedings were taken.'' (See, for instance, § 7 of the Validating Act of 1939, Stats. 1939, ch. 593, 3 Deering's Gen. Laws, Act 8920.)

It is said in 23 California Jurisprudence, page 611 that a curative act is one designed to give effect to past acts and transactions, which are ineffective because of failure to comply with some requirement of law, by correcting errors of mere mode and form, or supplying omissions the necessity of which might have been dispensed with by the prior statute; and that ''curing the failure to comply with statutory require-

ments in the proceedings of municipal bodies, are familiar examples of curative statutes.''

We fail to see the applicability of such curative statutes to the situation before us. It is not contended by respondent that any past acts or transactions involved herein were ineffective, or that there were errors or omissions needing correction. Certainly such curative acts could not have the effect of adding to the bond contract something not inherent therein, nor add to the rights of the present bondholders any rights not conferred by the contract as stated in the bonds and/or conferred by the statutes in effect at the time of their issuance.

It appears from the agreed statement before us, that by its resolution of September 26, 1946, which is attached as an exhibit to the statement, all that respondent was instructed to do was to transfer from the reserve funds to the regular bond funds the sum of approximately $15,000, so there would then be in such bond funds sufficient money to pay the obligations accruing on the outstanding bonds on January 1, 1947, which would obviate the necessity of making calls for such purposes, and still leave in the reserve funds approximately $53,000. We do not read the statutes applicable to the making of calls for the purpose of meeting obligations to become due on a given date to require that calls be made if there is already in the bond fund sufficient to meet such payments. (See Pol. Code, § 3480, at p. 242.) Nor have we been cited to any provision of section 3480e requiring that any specific amounts must be retained in the reserve funds. Therefore, even if it were conceded that the bondholders have a right to have reserve funds maintained, it would not follow that their rights would be infringed by the transfer proposed to be made by the trustees.

The moneys in the reserve funds are moneys which have been paid in by the landowners; they are earning no interest. It is therefore plainly to the interest of the landowners that such funds be used to pay accruing obligations on the bonds and that they be relieved of the obligation to meet calls for that purpose, especially since there appears to be ample security for the bonds which are constantly decreasing in number while the security represented by the surplus assessment remains constant.

It is therefore ordered that a writ of mandate issue directing respondent to transfer from the respective reserve funds of the district, to the respective bond funds thereof, the amounts set forth in the resolution of the board dated Sep-

tember 26, 1946, such moneys so transferred to be used solely for the purpose of paying principal and interest on the refunding bonds.

Thompson, J., and Peek, J., concurred.

A petition for a rehearing was denied April 30, 1948, and respondent's petition for a hearing by the Supreme Court was denied May 27, 1948. Traynor, J., and Schauer, J., voted for a hearing.